UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA,

                               :

          Plaintiff,

                               :

        -v.-                        :     **VERIFIED COMPLAINT FOR FORFEITURE**

ANY AND ALL FUTURE FEES OWED TO
SHELDON SILVER BY WEITZ &amp;         :     20 Civ. ___ (___)
LUXENBERG, P.C. RELATED TO ANY
REFERRALS OF PATIENTS BY ROBERT     :
TAUB TO WEITZ &amp; LUXENBERG, P.C.
THAT OCCURRED PRIOR TO 2008,        :

          Defendant-*in-rem*.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff the United States of America (the "Government"), by its attorney Audrey Strauss,

Acting United States Attorney for the Southern District of New York, for its verified complaint

(the "Verified Complaint") alleges, upon information and belief, as follows:

### INTRODUCTION

       1.      This action is brought by the Government pursuant to Title18, United States

Code, Section 981(a)(1)(C) seeking the forfeiture of certain property traceable to and/or involved

in a bribery scheme.

       2.      By this Verified Complaint, the Government seeks forfeiture of all right, title and

interest in the following property:

      Any and all future fees owed to Sheldon Silver by Weitz & Luxenberg, P.C. related to
      any referrals of patients by Robert Taub to Weitz & Luxenberg, P.C. that occurred prior
      to 2008 (collectively, the "Defendant-*in-rem*").

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and

1355(a) and (b)(1)(A).

4.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and

omissions giving rise to the forfeiture took place in the Southern District of New York.

Background

5.      On or about January 21, 2015, Sheldon Silver was charged in a criminal

Complaint (the "Complaint"). The Complaint is enclosed as Exhibit A and incorporated by

reference herein.

6.      On or about April 23, 2015, Superseding Indictment S1 15 Cr. 93 (VEC) (the

"Indictment") was returned. The Indictment is enclosed as Exhibit B and incorporated by

reference herein.

7.      The Indictment charged Silver, the longtime Speaker of the New York State

Assembly, with soliciting and accepting millions of dollars in bribes, committing extortion under

color of official right, and laundering the proceeds of his crimes.

8.      Counts One and Two charged Silver with honest services mail and wire fraud,

respectively, in connection with a scheme to provide official action in exchange for valuable

information on mesothelioma patients and resulting fees (the "Mesothelioma Scheme"), in

violation of 18 U.S.C. §§ 1341, 1343, and 1346. Counts Three and Four charged Silver with

honest services mail and wire fraud, respectively, in connection with a scheme to provide official

action in exchange for valuable real estate business and resulting fees (the "Real Estate

Scheme"), in violation of 18 U.S.C. §§ 1341, 1343, and 1346. Counts Five and Six charged

Silver with extortion under color of official right in connection with the Mesothelioma and Real

Estate Schemes, respectively, in violation of 18 U.S.C. § 1951. Count Seven charged Silver with

engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957.

9.     On or about November 30, 2015, after a trial before the Honorable Valerie E. Caproni, United States District Judge (the "District Court"), a jury found Silver guilty of all counts.

10.     Subsequently, the Supreme Court, in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), considered the definition of "official act" under the general federal bribery statute, 18 U.S.C. § 201, and adopted a two-part test for what qualifies as such an act.

11.     The Second Circuit subsequently rejected Silver's challenges to the sufficiency of the evidence but vacated Silver's convictions so that he could be re-tried under jury instructions that comported with *McDonnell. United States v. Silver*, 864 F.3d 102 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018).

12.     On or about May 11, 2018, after a two-week trial, a jury again found Silver guilty of all counts.

13.     On or about July 27, 2018, the District Court sentenced Silver to 84 months' imprisonment on each count, to be served concurrently, fined him $1.75 million, and ordered him to forfeit more than $3.7 million.   Silver again appealed.

14.     On or about January 21, 2020, the Second Circuit issued an opinion reversing in part, vacating in part, and affirming in part. *United States v. Silver*, 948 F.3d 538 (2d Cir.), *stay denied*, 954 F.3d 455 (2d Cir.), *pet. for cert. filed*, --- S. Ct. ---, No. 20-60 (U.S. July 20, 2020).

15.     On or about July 20, 2020, the District Court re-sentenced Silver to 68 months' imprisonment on each count, to be served concurrently, fined him $1 million, and ordered him to

forfeit more than $1.3 million, plus specific property. The District Court's forfeiture order (the "Forfeiture Order") is enclosed as Exhibit C and incorporated by reference herein.

<u>The Mesothelioma Scheme and the Defendant-*in-rem*</u>

16.     As described in detail in the Complaint and the Indictment, and as proven at both the initial trial and the re-trial, in the Mesothelioma Scheme, Silver agreed to take, and did take, official acts on behalf of Dr. Robert Taub, a prominent mesothelioma doctor, in exchange for lucrative referrals to patients with mesothelioma sent to Silver at a law firm, Weitz & Luxenberg ("W&L"), where Silver was "of counsel." *See Silver*, 864 F.3d at 106-08. When those referrals led to W&L taking a case, Silver was entitled to a percentage of the fees earned by W&L on a contingent basis, which often were paid years after the referral took place, as a case settled, in whole or in part, or was tried and resulted in a favorable judgment. *See id.* at 107, 109; *see also Silver*, 964 F.3d at 560-61, 573-74.

17.     While it reversed Silver's conviction in connection with the Mesothelioma Scheme on statute of limitations ground, the Second Circuit explained that the charged and proven conduct was "a classic example of bribery, and, but for the statute of limitations, [his] conviction for the Mesothelioma Scheme would stand." *Silver*, 948 F.3d at 577. The Second Circuit identified 2008 as the end of that scheme for criminal statute of limitations purposes,. *See id.* at 572-73, 576-77. Therefore, any fees paid or owed to Silver by W&L relating to referrals from Dr. Taub prior to 2008 constitute proceeds of the Mesothelioma Scheme.

18.     Consistent with the Second Circuit's decision, the parties agreed, in the Forfeiture Order, "that any future fees to be paid to [Silver] by Weitz & Luxenberg to the extent those fees relate to referrals from Robert Taub made prior to 2008 (the 'Pre-2008 Taub Referrals W&L

Fees') [i.e. the Defendant-*in-rem*] are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C)."  (Ex. C, at 5-6.)

19.     The Forfeiture Order further stated that Silver "consents to the administrative or civil forfeiture of the Pre-2008 Taub Referrals W&L Fees, and agrees that he will not file a claim or a petition for remission or mitigation or otherwise contest the civil or administrative forfeiture of the Pre-2008 Taub Referrals W&L Fees, and will not assist anyone else in doing so; and [Silver] also waives all rights to service or notice of the any administrative or civil forfeiture proceeding with respect to the Pre-2008 Taub Referrals W&L Fees[.]" (*Id.* at 6; *see also id.* ¶ 12 ("The defendant shall not file a claim or a petition for remission or mitigation or otherwise contest the civil or administrative forfeiture of the Pre-2008 Taub Referrals W&L Fees, and will not assist anyone else in doing so. The defendant has waived all rights to service or notice of the any administrative or civil forfeiture proceeding with respect to the Pre-2008 Taub Referrals W&L Fees.").)

### FIRST CLAIM
### (FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(C))

20.     The Government incorporates by reference paragraphs 1 through 19 above as if fully set forth herein.

21.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> [a]ny property, real or personal, which constitutes or is derived
> from proceeds traceable to . . . any offense constituting 'specified
> unlawful activity' (as defined in section 1956(c)(7) of this title), or
> a conspiracy to commit such offense.

22.     Title 18, United States Code, Section 1956(c)(7)(A) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1)."

23.     Title 18, United States Code, Section 1961(1)(B), in turn, specifically refers to "any act which is indictable under any of the following provisions of Title 18, United States Code: . . . [including] Section 1341 (relating to mail fraud), [and] Section 1343 (relating to wire fraud) . . . ."

24.     Section 1341 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" shall be subject to criminal penalty.

25.     Section 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" shall be subject to criminal penalty.

26.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 18, United States Code, Sections 1341 and 1343.

## **REQUEST FOR RELIEF**

WHEREFORE plaintiff, the United States of America, requests that judgment be entered as follows:

A.    Enter judgment against the Defendant-*in-rem*, and in favor of the United States, on the first claim alleged in the Verified Complaint;

B.    Issue process to enforce the forfeiture of the Defendant-*in-rem*, requiring that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law; and

C.    Grant the Government such further relief as this Court may deem just and proper, together with the costs and disbursements in this action.

Dated:    New York, New York
          August 25, 2020

                              AUDREY STRAUSS
                              Acting United States Attorney
                              Attorney for the United States of America

                    By:    s/ Daniel C. Richenthal
                           DANIEL C. RICHENTHAL
                           Assistant United States Attorney
                           One Saint Andrew's Plaza
                           New York, New York 10007
                           Telephone: (212) 637-2109

## VERIFICATION

STATE OF NEW YORK             )
COUNTY OF NEW YORK         :
SOUTHERN DISTRICT OF NEW YORK   )

      Anthony Casola, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and as such has responsibility for the within action; that he has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

      The sources of deponent's information and the ground of his belief are official records and files of the United States, public information, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives during an investigation of alleged violations of Title 18, United States Code.

  Date: August 25, 2020

                           Anthony Casola
                           Special Agent
                           Federal Bureau of Investigation

ORIGINAL

15 MAG 070

Approved: _____
CARRIE H. COHEN/HOWARD S. MASTER/ANDREW D. GOLDSTEIN
Assistant United States Attorneys

Before: THE HONORABLE FRANK MAAS
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT
FILED
JAN 21 2015
S. D. OF N.Y.

- - - - - - - - - - - - - - - x
                :

UNITED STATES OF AMERICA

                :

       - v. -

                :

SHELDON SILVER,

                :

         Defendant.

                :

- - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

**DOC # 1**

Violations of
18 U.S.C. §§ 1341, 1343,
1346, 1349, and 1951

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

ROBERT W. RYAN, being duly sworn, deposes and says that he is a Criminal Investigator with the United States Attorney's Office for the Southern District of New York, and charges as follows:

### COUNT ONE

1. From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the New York State Assembly, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SILVER used the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Sections 1343 and 1346.)

## COUNT TWO

2.    From at least in or about 2000, up to and including
the date of this Complaint, in the Southern District of New York and
elsewhere, SHELDON SILVER, the defendant, willfully and knowingly,
having devised and intending to devise a scheme and artifice to
defraud, and to deprive the public of its intangible right to SILVER's
honest services as an elected legislator and as the Speaker of the
New York State Assembly, for the purpose of executing such scheme
and artifice and attempting to do so, placed in a post office and
authorized depository for mail matter, a matter and thing to be sent
and delivered by the Postal Service and deposited and caused to be
deposited a matter and thing to be sent and delivered by private and
commercial interstate carrier, and took and received therefrom, such
matter and thing, and knowingly caused to be delivered by mail and
such carrier according to the direction thereon, such matter and
thing, to wit, SILVER used the power and influence of his official
position to obtain for himself millions of dollars in bribes and
kickbacks masked as legitimate income earned by SILVER as a private
lawyer.

(Title 18, United States Code, Sections 1341 and 1346.)

## COUNT THREE

3.    From at least in or about 2000, up to and including
the date of this Complaint, in the Southern District of New York and
elsewhere, SHELDON SILVER, the defendant, and others known and
unknown, willfully and knowingly did combine, conspire, confederate,
and agree together and with each other to commit honest services mail
fraud in violation of Title 18, United States Code, Sections 1341
and 1346.

4.    It was a part and an object of the conspiracy that
SHELDON SILVER, the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to defraud,
and to deprive the public of its intangible right to SILVER's honest
services as an elected legislator and as the Speaker of the New York
State Assembly, for the purpose of executing such scheme and artifice
and attempting to do so, placed in a post office and authorized
depository for mail matter, a matter and thing to be sent and
delivered by the Postal Service and deposited and caused to be
deposited a matter and thing to be sent and delivered by private and

commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, such matter and thing, in violation of Title 18, United States Code, Sections 1341 and 1346, to wit, SILVER agreed with others known and unknown, including a co-conspirator not named herein ("CC-1"), to use the power and influence of his official position to induce certain real estate developers with significant business before the State of New York to retain the law firm of CC-1 in exchange for hundreds of thousands of dollars in secret bribes and kickbacks paid to SILVER by the law firm, which were masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR

5.     From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, did obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and did thereby obtain property not due SILVER or his office and to which SILVER was not entitled, under color of official right, to wit, SILVER used the power and influence of his official position to obtain for himself millions of dollars masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Section 1951.)

## COUNT FIVE

6.     From at least in or about 2000, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to willfully and knowingly obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and did thereby obtain property not due SILVER or his office and to which SILVER was not entitled, under color of official right, to wit,

3

SILVER agreed with others known and unknown, including CC-1, to use the power and influence of his official position to obtain for himself hundreds of thousands of dollars masked as legitimate income earned by SILVER as a private lawyer.

(Title 18, United States Code, Section 1951.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

7.    I am a Criminal Investigator with the United States Attorney's Office for the Southern District of New York ("USAO SDNY"), and have been in that position for approximately eight years. I have been personally involved in the investigation of this matter along with Special Agents of the Federal Bureau of Investigation (the "FBI") and other Criminal Investigators of the USAO SDNY (collectively, the "Investigative Team"). Previously, I was a Special Agent of the U.S. Department of Housing and Urban Development - Office of the Inspector General ("HUD-OIG") for three years, and prior to that I was a Special Agent of the Internal Revenue Service - Criminal Investigation ("IRS-CI") for 14 years. While with the USAO SDNY, HUD-OIG, and IRS-CI, I have participated in multiple investigations of public corruption offenses, among other offenses.

8.    I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, and from my conversations with other law enforcement officers, including members of the Investigative Team and others. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every fact I have learned during the investigation. Where the actions, statements, and conversations of others are recounted herein, they are related in substance and in part, unless otherwise indicated.

## OVERVIEW

9.    SHELDON SILVER, the defendant, has engaged in and continues to engage in a secret and corrupt scheme to deprive the citizens of the State of New York (the "State") of his honest services, and to extort individuals and entities under color of official right, as an elected legislator and as Speaker of the New York State Assembly (the "Assembly"). For more than a decade, SILVER repeatedly has represented publicly that his outside income as a private lawyer is derived from private citizens who seek him out for legal services in personal injury matters, and that none of his

4

clients has any business before the State. SILVER also has
represented through the State's mandatory financial disclosure
filings that he derives his outside income as a private lawyer from
"representing individual clients" in "personal injury actions" as
"of counsel" to the law firm Weitz & Luxenberg, P.C. ("Weitz &
Luxenberg"). These representations were and are materially false
and misleading. In truth and in fact, SILVER has obtained millions
of dollars in outside income as a direct result of his corrupt use
of his official position to obtain attorney referral fees for
himself, including from clients with substantial business before the
State, and not as a result of legitimate outside income SILVER earned
as a private lawyer.

        10.   The investigation to date has revealed that SHELDON
SILVER, the defendant, received more than $6 million in outside
income from two law firms since late 2002, consisting of the
following:

            a.   Approximately $700,000 in undisclosed bribes
and kickbacks obtained in a scheme described in detail below, whereby
SILVER used his power and influence as an elected legislator and as
Speaker of the Assembly to induce real estate developers with
business before the State to retain and continue to use a real estate
law firm (the "Real Estate Law Firm") controlled by an attorney who
previously had worked as SILVER's counsel in the Assembly ("CC-1"),
and who caused SILVER to be paid for such referrals by the Real Estate
Law Firm.

            b.   More than $5.3 million in payments from Weitz
& Luxenberg in the form of: (i) a salary of approximately $120,000
annually, totaling more than $1.4 million during the relevant time
period, which SILVER received based on his official position rather
than any work he was expected to perform for clients of the firm,
plus (ii) approximately $3.9 million in attorney referral fees, over
$3 million of which SILVER obtained through a corrupt scheme
described in greater detail below, whereby SILVER obtained referrals
of asbestos cases from a doctor ("Doctor-1") by using his official
position to secretly direct $500,000 in State funds to Doctor-1's
research and provide additional benefits to Doctor-1 and his family.

        11.   SHELDON SILVER, the defendant, had no involvement in
the work of the Real Estate Law Firm or Weitz & Luxenberg's asbestos
practice, and he has never performed any legal work whatsoever for
either the Real Estate Law Firm's real estate developer clients or
Weitz & Luxenberg's asbestos clients. In short, as set forth below,

5

there is probable cause to believe that SILVER obtained approximately $4 million in payments characterized as attorney referral fees solely through the corrupt use of his official position.

12.   When, in or about 2013, the Moreland Commission to Investigate Public Corruption (the "Moreland Commission") began to investigate outside income earned by SHELDON SILVER, the defendant, and other State legislators, SILVER took legal action and other steps to prevent the disclosure of such information to the Moreland Commission.

## BACKGROUND

### *The Legislature and*
### *Silver's Authority and Compensation as Assembly Speaker*

13.   I have learned the following from my review of publicly available State government documents, and my training, experience, and participation in the investigation:

a.   The New York State Legislature (the "Legislature") is seated in the State Capitol in Albany.   As provided for in Article III of the New York State Constitution and State law, the Legislature consists of two houses: the Assembly, which has 150 elected members, and the State Senate (the "Senate"), which has 63 elected members.   The leader of the Assembly, who is elected by its members, is referred to as the Speaker of the Assembly.

b.   Members of the Legislature generally are permitted to hold outside employment and earn outside income at the same time they serve as legislators.   However, because of the obvious potential for abuse that arises when members of the Legislature receive outside income, State law restricts to some degree such employment to avoid, among other things, conflicts and potential conflicts of interest.   Additionally, as discussed in greater detail below, State law requires members of the Legislature to disclose annually certain information about their outside income, including the sources of that income.

c.   In or about 1976, SHELDON SILVER, the defendant, was elected as a member of the Assembly in an Assembly District that comprises much of lower Manhattan.   In or about 1994, SILVER was elected Speaker of the Assembly, a position he continues to hold more than two decades later.

6

d.    Pursuant to the Rules of the Assembly and other provisions of State law and practice, the Speaker of the Assembly has significant power over the Assembly, including appointing the chairperson and members of all Assembly committees, creating subcommittees and task forces and appointing the chairperson and members thereof, overseeing the Assembly's rules and regulations, presiding over the Assembly, and controlling legislative sessions, including bringing certain legislation to the floor for debate.    In addition, the Speaker of the Assembly plays a key role in negotiation of the State budget and the allocation of certain State funds to various entities.

e.    As a member of the Assembly, SILVER is paid the same annual base salary as other Assembly members, which currently is $79,500.    In addition to his base salary, SILVER is paid an additional salary of $41,500 for serving as Speaker of the Assembly. Accordingly, SILVER's total annual monetary compensation for his official duties is $121,000, plus per diem pay, a car and driver, and travel reimbursement.

### *Silver's Power and Influence Over the Real Estate Industry and Health Care Funding*

#### The Real Estate Industry

14.    I have learned the following about the role of SHELDON SILVER, the defendant, in regulating the State's real estate industry from individuals who are in the business of lobbying State elected officials on behalf of, among other entities, a New York-based real estate developer ("Developer-1") (the "Lobbyists"), a representative from Developer-1, representatives of another New York-based real estate developer ("Developer-2"), records obtained from the Moreland Commission after the Governor of the State disbanded it as described in greater detail below, public records, and my training, experience, and participation in the investigation:

a.    The Legislature, including the Assembly, has a significant role in regulating the real estate industry in the State. In particular, the Legislature regulates the real estate industry by, among other things, passing laws governing real estate taxation, rent, land use, and other matters.    In addition to controlling key aspects of real estate regulation, the State also sponsors and provides governmental subsidies and tax incentives that have significant financial value to certain participants in the real estate industry.    Among other programs of this nature are (i) a

7

program known as the "80/20 program," under which qualifying developers of residential rental real estate are eligible for government-subsidized financing and tax credits, in exchange for keeping at least 20 percent of units affordable for low and moderate income renters for a set period of time, and (ii) a program known as the "421-a program" under which substantial real estate tax abatements are provided for certain new residential real estate developments. Several of these regulations and programs, in particular those relating to rent regulation and tax abatements, expire periodically and thus must be renegotiated and reapproved by the Legislature, including the Assembly, if they are to continue.

b.      In part due to the importance of the Legislature to the real estate industry, real estate developers, including Developer-1, are some of the largest contributors to campaigns of candidates for State office and to political committees controlled by leaders of the Legislature, including SILVER. For example, I have learned that from in or about 2005 through in or about 2014, Developer-1 has contributed more than $10 million to candidates for State office and State political committees, including to committees of both major political parties, making it the largest political contributor of any person or entity to State candidates or committees during that time period. Developer-1's more than $10 million in contributions includes approximately $200,000 to SILVER and a political committee SILVER controls.

c.      Real estate developers and associations of real estate developers also retain lobbyists to lobby legislators, including SILVER, among others, in order to ensure that their interests are represented effectively before SILVER and other key decision makers in State government. For example, in or about 2014, Developer-1 paid approximately $900,000 to eight different lobbyists, including the Lobbyists, to lobby State government officials, including SILVER.

## Health Care Funding

15.     I have learned the following from my review of publicly available State government documents, individuals currently or formerly employed by the New York State Department of Health ("DOH"), and my training, experience, and participation in the investigation:

a.      SHELDON SILVER, the defendant, has exercised, and continues to exercise, control over several sources of State

8

Case 1:20-cv-06991-VEC Document 1 Filed 08/26/20 Page 9 of 35

funding as Speaker of the Assembly.  Funding that SILVER has controlled since becoming Speaker of the Assembly includes discretionary money that is allocated to the Assembly for use by its members ("member items"), and capital funding through certain State public authorities that is available to projects backed by SILVER. In addition to general-purpose member item funding and capital funding, discretionary funds over which SILVER has exercised control include funding available to the Assembly until in or about 2007 under legislation entitled the New York State Health Care Reform Act ("HCRA").[1]  Specifically, until in or about 2007, up to $8.5 million was allocated to the Assembly annually under HCRA, to be disbursed through DOH at the discretion of the Speaker of the Assembly, i.e., SILVER (the "HCRA-Assembly Pool").

             b.    Until in or about April 2005, the HCRA-Assembly Pool was not part of the State budget, and disbursements from the HCRA-Assembly Pool were not disclosed in the budget.  Beginning in or about April 2005 through in or about 2007, the HCRA-Assembly Pool was included in the State budget, but it was listed as a lump sum $8.5 million line item, without any public disclosure of the recipients of the funds from the HCRA-Assembly Pool or the purported intended use of such funds.

             c.    To disburse funds from the HCRA-Assembly Pool, a letter from SILVER was sent to DOH, accompanied by a form called a Legislative Initiative Form, which provided the purported intended purpose of the disbursement.  DOH had no role in selecting recipients of the HCRA-Assembly Pool funds or evaluating the intended use of such funds.  Grants from the HCRA-Assembly Pool differed from other grants that DOH has administered in certain limited research areas, which are subject to a formal application process and peer review. Thus, SILVER was able to distribute money from the HCRA-Assembly Pool at his discretion, with no public disclosure of the disbursements.

             d.    In or about January 2007, the State, to increase transparency about the spending of State funds, adopted legislation called the Budget Reform Act of 2007 prohibiting "lump-sum" appropriations by the Legislature, such as the HCRA-Assembly Pool. Instead, any discretionary appropriations added to the budget by the Legislature had to be itemized appropriations that, unlike expenditures made from the HCRA-Assembly Pool, had to be publicly disclosed.  Pursuant to the Budget Reform Act of 2007 and as a

---

[1] Pub. Health L. § 2807-L(1)(c)(iii)(B).

9

cost-saving measure, the HCRA-Assembly Pool was abolished and was no longer available after 2007.

### SILVER'S PUBLIC REPRESENTATIONS ABOUT HIS OUTSIDE INCOME

16.    I have learned the following from records obtained from the New York State Legislative Ethics Commission (the "Ethics Commission"), public records, and my training, experience, and participation in the investigation:

a.    Pursuant to the New York State Public Officers Law, members of the Legislature are required to file financial disclosure statements on an annual basis with the Ethics Commission. The financial disclosure statement is entitled "Annual Statement of Financial Disclosure" (the "Disclosure Form") and is required to be signed and presented for filing by the reporting individual.

b.    A primary purpose of the Disclosure Form is to require legislators to disclose outside income, activities, finances, and assets that may indicate a financial impropriety or conflict of interest.

c.    The Disclosure Form requires reporting individuals to answer a variety of questions about themselves and their spouses related to, among other things, outside employment and income, involvement with not-for-profit corporations and political parties, investments, assets, loans, gifts, and reimbursements. Beginning in or about 2013, the Disclosure Forms have been posted on the Internet by the New York State Joint Commission on Public Ethics and available to the general public.

d.    If a Disclosure Form is offered or presented that knowingly contains a false statement or false information, it may serve as the basis for prosecution under the New York Penal Law.[2]

e.    At all times relevant to this Complaint, the Disclosure Form required reporting individuals to answer the following questions "completely," among others:

i.    Question No. 8 required reporting individuals who also are attorneys to give a "general description of the principal subject areas" of their practice.

---

[2] See, e.g., N.Y. Penal Law § 175.30 (offering a false instrument for filing in the second degree).

10

              ii.    Question No. 13 required reporting individuals to list the "nature and amount of any income in EXCESS of $1,000 from EACH SOURCE." (Emphasis in original.)

             f.    As he was required to do, SHELDON SILVER, the defendant, filed Disclosure Forms with the Ethics Commission on an annual basis. For the calendar years 2002-2013, SILVER provided the following answers to Questions 8 and 13 on his Disclosure Forms:

11

| Year | Question 8 "General Description of the Principal Subject Areas" of Practice | Question 13 | | |
|------|------|------|------|------|
| | | Source of Income | Nature of Income | Amount of Income |
| 2002 | "Limited practice of law in the principal subject area of personal injury claims on behalf of individual clients.   Since September 2002, of counsel to law firm." | "Law Practice"

"of counsel practice Weitz & Luxenberg" | "Fees"

"Fees" | $20,000 to under $60,000

$20,000 to under $60,000 |
| 2003 | "Limited practice of law in the principal subject area of personal injury claims on behalf of individual clients and of counsel to law firm." | "Weitz & Luxenberg of Counsel" | "Fees" | $100,000 to under $250,000 |
| 2004 | [same as 2003] | [same as 2003] | "Fees" | $100,000 to under $250,000 |
| 2005 | [same as 2003 and 2004] | [same as 2003 and 2004] | "Fees" | $250,000 or over |
| 2006 | [same as 2003-2005] | [same as 2003-2005] | "Fees" | $250,000 or over |
| 2007 | "Limited to practice of law in the principal subject area of personal injury claims on behalf of individual clients and of counsel to law firm." | "Weitz & Luxenberg" | "Fees" | $250,000 or over |
| 2008 | [same as 2007] | [same as 2007] | "Fees" | $250,000 or over |
| 2009 | "Limited practice of law in the predominant area of personal injury claims on behalf of individual clients and of counsel to law firm." | "Law Practice (including Weitz & Luxenberg)" | "Fees" | $250,000 or over |
| 2010 | [same as 2009] | "Law Practice" | "Including of Counsel to W&L Esq." | $250,000 or over |
| 2011 | "General practice of law with emphasis on representation of individual clients and personal injury actions and of counsel to law firm." | "Law Practice" | "Including of Counsel to W&L Esq." | $250,000 or over |
| 2012 | "General practice of law with emphasis on representation of individual clients and personal injury actions and 'of counsel' to law firm." | "Law Practice" | "Including of Counsel to W&L" | $350,000 to under $450,000[3] |
| 2013 | [same as 2012] | "Law Practice" | "Including of Counsel of W&L" | $650,000 to under $750,000 |

17.    As reflected above, from the beginning of his employment as "of counsel" to Weitz & Luxenberg in 2002 through 2008, the only source of income from the practice of law reported by SHELDON

---

[3] 2012 was the first year for which the Disclosure Forms required income exceeding $250,000 to be further broken down.

SILVER, the defendant, was "fees" received from Weitz & Luxenberg. Beginning with his 2009 Disclosure Form, which was filed with the Ethics Commission in or about May 2010, SILVER described the source of his legal income as "Law Practice," and noted that such source "includ[ed]" being of counsel to Weitz & Luxenberg. In no year from 2002 through 2013 did SILVER report that he received income from the Real Estate Law Firm or from any law firm other than Weitz & Luxenberg.

        18.    Based on my review of an analysis by the Moreland Commission of disclosures by SHELDON SILVER, the defendant, and other members of the Legislature, SILVER reported more outside income from the practice of law than any other member of the Legislature in calendar year 2012, the first year for which the Disclosure Forms required a more detailed breakdown of outside income exceeding $250,000.

        19.    I have learned the following from my review of public statements made by SHELDON SILVER, the defendant, as well as statements made by SILVER's official spokesperson, who has confirmed that his representations to the public about SILVER's outside income were accurately reported and based on information provided to him by SILVER:

        a.    SILVER has claimed publicly that his private legal work consists of spending several hours each week evaluating legal matters brought to him by potential clients and then referring cases that appear to have merit to attorneys at Weitz & Luxenberg.

        b.    SILVER has stated that he represents "plain, ordinary simple people."

        c.    SILVER's spokesman recently stated that potential clients find SILVER by virtue of his being a "lawyer for more than 40 years," and that SILVER's ability to find clients was "not unlike any other attorney in this state, anywhere."

        d.    SILVER further has insisted publicly on numerous occasions that his legal work has no connection to his official position or to State government, and SILVER's official spokesperson recently stated that "[n]one of [SILVER'S] clients have any business before the state." SILVER never has acknowledged publicly receiving any money from a real estate law firm or providing any sort of representation in real estate matters. Nor has SILVER publicly acknowledged receiving any money from asbestos matters specifically.

13

**THE INVESTIGATION OF SILVER'S OUTSIDE INCOME FROM LAW FIRMS**

20.    Based on information obtained from, among other sources, the Investigative Team's prior investigations of corruption by members of the Legislature, cooperating witnesses related to those investigations, and review of public disclosures and statements by SHELDON SILVER, the defendant, a grand jury investigation was initiated concerning the outside income of SHELDON SILVER, the defendant, in or about June 2013.   In connection with that investigation, the Investigative Team has, among other things, obtained documents and witness statements voluntarily and pursuant to grand jury subpoena; reviewed public records; obtained and reviewed material from the Moreland Commission under circumstances described below; and conducted analyses of these records.

21.    In light of the fact that SHELDON SILVER, the defendant, reported to the Ethics Commission in his Disclosure Forms that he had earned hundreds of thousands of dollars in legal fees from a practice with a "predominant" or "principal" emphasis on "personal injury claims on behalf of individual clients," I and other members of the Investigative Team conducted searches on government databases that report on cases litigated in State and federal courts to identify cases in which SILVER had entered an appearance as an attorney from in or about 2002 to the present.   This research identified no cases in which SILVER had entered an appearance as a lawyer.

22.    In order to investigate the sources of outside income paid to SHELDON SILVER, the defendant, I obtained documents from Weitz & Luxenberg pursuant to grand jury subpoena and learned the following:

a.    Weitz & Luxenberg paid SHELDON SILVER, the defendant, a base salary of approximately $120,000 annually.

b.    SILVER received millions of dollars in referral fees from Weitz & Luxenberg.   Records reflect that SILVER was credited with referring more than 100 clients to the firm, the majority of which were referred for potential asbestos litigation, rather than negligence or other types of personal injury litigation as SILVER had claimed publicly.[4]

---

[4] I have reviewed Weitz & Luxenberg's website, which distinguishes asbestos cases – a type of products liability case – from "personal injury and malpractice" cases.

14

          c.     The USAO SDNY's grand jury subpoena sought records related to work actually performed by SILVER for Weitz & Luxenberg. That request resulted in production of documents related to a single property dispute in which SILVER, along with other Weitz & Luxenberg attorneys, represented an individual who I learned through public records was employed by the Legislature. SILVER did not earn fees of any kind for that representation.

          d.     Weitz & Luxenberg paid SILVER more than $3.2 million in referral fees from 2003 through in or about November 2014 for asbestos cases that SILVER was credited with referring to Weitz & Luxenberg, compared to less than $650,000 in referral fees for all other matters (specifically, negligence/personal injury and motor vehicle accident cases) that he was credited with referring to the firm.

          23.    Following receipt of the above information, I, along with other members of the Investigative Team, attempted to contact asbestos clients of Weitz & Luxenberg for whom SHELDON SILVER, the defendant, received referral fee credit. If the clients were deceased, we attempted to contact surviving family members who might be aware of the circumstances under which Weitz & Luxenberg was retained. The Investigative Team spoke to more than ten such individuals and learned the following:

          a.     None of the asbestos clients and/or surviving family members had ever contacted SILVER to seek legal representation or for any other purpose, nor had they ever been contacted by SILVER. No asbestos client and/or surviving family member was aware of any role played by SILVER in providing legal services to himself or herself or a family member.

          b.     Several asbestos clients and/or surviving family members identified Doctor-1, who specializes in treating patients suffering from an asbestos-related cancer called mesothelioma and works at a University in Manhattan ("University-1"), as a treating physician. Several of these individuals also stated that Doctor-1 had recommended that they or their family member retain Weitz & Luxenberg. One patient of Doctor-1 who retained Weitz & Luxenberg recalled that Doctor-1 had referenced his relationship with SILVER in recommending Weitz & Luxenberg, but that patient also stated he had never spoken with SILVER and SILVER played no known role in evaluating his case or representing him.

c. Several of the clients and surviving family members reside in states other than New York. After clients retained Weitz & Luxenberg, they engaged in regular contact with the firm by interstate telephone calls (with respect to the out-of-state clients) and by United States mail and/or a private overnight mail carrier. The firm provided and requested frequent mailings concerning intake information, case status, and payments.

24. Based on records provided by Weitz & Luxenberg, I learned that certain payments to SHELDON SILVER, the defendant, from Weitz & Luxenberg were made to a bank account in the name of "Sheldon Silver, Esq." I and other members of the Investigative Team obtained and reviewed records relating to this account and learned that, in addition to depositing payments from Weitz & Luxenberg into that account, SILVER deposited hundreds of thousands of dollars in payments from the Real Estate Law Firm into the account.

25. After identifying the additional source of income that SHELDON SILVER, the defendant, obtained from the Real Estate Law Firm, the Investigative Team obtained and reviewed records of the Real Estate Law Firm concerning the payments that the Real Estate Law Firm made to SILVER. Those records reflected that from at least in or about 2004 through in or about December 2014, SILVER was paid nearly $700,000 from the Real Estate Law Firm in what were described as "referral fees" attributed to SILVER's referral of Developer-1 and Developer-2 to the Real Estate Law Firm.[5]

26. Based on my review of a preliminary analysis of the records described above, I have determined that SHELDON SILVER, the defendant, received a total of more than $6 million in outside income from 2002 to the present from Weitz & Luxenberg and the Real Estate Law Firm, consisting of the following:

---

[5] Financial records provided by the Real Estate Law Firm for the period up to and including 2005 were incomplete. Accordingly, it is possible that SILVER obtained even more money from the Real Estate Law Firm than is stated herein.

16

| Year | Real Estate Law Firm Referral Fees | Weitz & Luxenberg | | | | Grand Total |
| | | Asbestos Referral Fees | All Other Referral Fees | Salary | W&L Total | |
|---|---|---|---|---|---|---|
| 2002 | Incomplete Records | $0 | $0 | $37,384.66 | $37,384.66 | $37,384.66 |
| 2003 | Incomplete Records | $0 | $0 | $120,000.00 | $120,000.00 | $120,000.00 |
| 2004 | At least $3,606.17 | $0 | $0 | $120,000.00 | $120,000.00 | $123,606.17 |
| 2005 | At least $159,876.90 | $328,348.31 | $0 | $120,000.00 | $448,348.31 | $608,225.21 |
| 2006 | $14,238.18 | $300,723.98 | $16,956.81 | $120,000.00 | $437,680.79 | $451,918.97 |
| 2007 | $0 | $140,733.98 | $0 | $120,000.00 | $260,733.98 | $260,733.98 |
| 2008 | $806.81 | $239,313.57 | $284,357.82 | $120,000.00 | $643,671.39 | $644,478.20 |
| 2009 | $14,086.45 | $198,157.83 | $0 | $120,000.00 | $318,157.83 | $332,244.28 |
| 2010 | $73,134.45 | $570,017.75 | $38,973.80 | $120,000.00 | $728,991.69 | $802,126.00 |
| 2011 | $240,994.86 | $498,223.12 | $63,631.21 | $120,000.00 | $681,854.47 | $922,849.19 |
| 2012 | $104,356.82 | $206,007.77 | $5,047.70 | $120,000.00 | $331,055.61 | $435,412.29 |
| 2013 | $39,095.67 | $357,520.65 | $197,573.06 | $120,000.00 | $675,317.85 | $714,189.38 |
| 2014 | $35,317.32 | $440,605.75 | $21,591.80 | $120,000.00 | $582,197.55 | $617,514.87 |
| Grand Total | $685,513.63 | $3,279,652.71 | $628,132.20 | $1,477,384.66 | $5,385,169.57 | $6,070,683.20 |

27. As set forth above and explained in more detail herein, I respectfully submit that there is probable cause to believe that SHELDON SILVER, the defendant, obtained approximately $4 million of the income described above in exchange for his corrupt and secret use of his official position through at least two different means and methods: (i) steering real estate developers with significant and continuing business before the State to the Real Estate Law Firm, in exchange for kickbacks paid to him by CC-1 for such referrals; and (ii) soliciting and obtaining referrals at Weitz & Luxenberg from Doctor-1 in return for directing State grants to Doctor-1's research and undertaking other official actions on behalf of Doctor-1 and his family.

### SILVER'S CORRUPT ARRANGEMENT WITH THE REAL ESTATE LAW FIRM

28. I respectfully submit that there is probable cause to believe that the payments from the Real Estate Law Firm disguised as attorney "referral fees" and not reported by SHELDON SILVER, the

17

defendant, in his Disclosure Forms, are, in truth and in fact, corrupt kickbacks from the Real Estate Law Firm to SILVER in exchange for SILVER'S improper use of his official position to induce real estate developers who had and continue to have significant business before SILVER and the State to retain and continue to retain the Real Estate Law Firm.

     29. I have learned the following from representatives of the New York City Tax Commission (the "Tax Commission") and an attorney with the Real Estate Law Firm ("Attorney-1"),[6] a review of documents obtained from the Real Estate Law Firm, and my training, experience, and participation in the investigation:

     a. While certain regulatory and taxation matters and public subsidy programs are controlled entirely by the State, to the extent not controlled by the State, taxation of buildings in the City of New York (the "City") is controlled by City government.

     b. Owners of properties in the City can contest their property taxes in multiple ways. Among other things, owners can ask the City's Department of Finance for a reduced assessment, which serves as a basis for taxes imposed. Owners also can file what is known as a tax certiorari application with the Tax Commission contesting the assessment.

     c. Specialized law firms and law practices often handle real estate tax certiorari work. Tax certiorari attorneys typically bill on a contingency fee basis and thus receive a percentage of any reduction in taxes obtained as a result of tax certiorari petitions or lawsuits filed on behalf of their clients.

     d. CC-1 is an attorney who previously served as counsel to SHELDON SILVER, the defendant, in the Assembly and who founded and controls the Real Estate Law Firm, the practice of which consists almost exclusively of real estate tax certiorari work. Like others in the tax certiorari industry, the Real Estate Law Firm bills its clients on a contingency fee basis, typically obtaining as a fee up to 25 percent of any tax reductions it obtains on behalf of its clients. The Real Estate Law Firm only has two attorneys who work for it, namely, CC-1 and Attorney-1.

---

[6] Attorney-1 has provided information to the Government under an immunity order pursuant to which Attorney-1's testimony and other statements to the Government cannot be used directly or indirectly in any prosecution of Attorney-1 except in a prosecution for perjury, obstruction of justice, or making false statements.

18

e. Developer-1 and Developer-2 both became clients of the Real Estate Law Firm as a direct result of actions taken by SILVER, as described below. SILVER received a share of all fees that the Real Estate Law Firm received from representing Developer-1 and Developer-2. The outside income that SILVER was paid by the Real Estate Law Firm consists exclusively of SILVER's share of fees the Real Estate Law Firm obtained through its representation of Developer-1 and Developer-2.

f. The vast majority of the Real Estate Law Firm's tax certiorari filings relate to smaller properties with low initial valuations and, therefore, little opportunity for significant reductions in taxes and resulting contingency fees. In contrast, the Real Estate Law Firm's tax certiorari filings on behalf of Developer-1 and Developer-2 are for large properties with high valuations and, thus, larger opportunities for reductions in assessments and contingency fees. In or about 2011, for example, the Real Estate Law Firm represented approximately 19 properties owned by Developer-1 and Developer-2, constituting less than one percent of all properties represented by the firm that year, yet those 19 buildings contributed more than 31 percent of all revenue obtained by the Real Estate Law Firm that year.

g. SILVER has no background in real estate tax certiorari work and no experience performing such work. There is no record of SILVER ever appearing before the Tax Commission. SILVER in fact performed no work for the Real Estate Law Firm whatsoever, including in connection with the firm's representation of Developer-1 and Developer-2.

h. The Real Estate Law Firm pays SILVER periodically, often multiple times per year, by check, which is mailed from the Real Estate Law Firm to SILVER at his home address in Manhattan using the United States mail.

30. I have learned the following from individuals employed by or lobbying on behalf of Developer-1 and Developer-2, including the Lobbyists, and public sources:

a. Developer-1 is a major real estate developer and owner of luxury rental properties, collectively valued at more than $1 billion. In connection with these properties, Developer-1 has received substantial subsidies under the 80/20 program and tax abatements under the 421-a program, and the properties are subject

19

to rent regulations that may be adopted or amended by the State. Due to the overwhelming percentage of its business tied to State programs and regulations, Developer-1 is dependent on the continued existence of legislation and programs favorable to its business. Accordingly, Developer-1 often negotiates with leaders of State government, including SHELDON SILVER, the defendant; it has retained lobbyists to represent Developer-1 before the Legislature, including the Lobbyists, in part specifically for advocacy to SILVER; and, as described above, it is the largest political contributor in the State.

b.     Legislation governing the 80/20, 421-a, and rent regulation policies and programs, among other policies and programs (collectively, the "Real Estate Legislation") expires periodically, thus requiring the Legislature to renew the Real Estate Legislation in order for the policies and programs to continue. The Real Estate Legislation is due to expire again in or about June 2015, and negotiations concerning its renewal are expected to begin in the very near future.

31.    I have learned the following from Attorney-1 and my review of records obtained from the Real Estate Law Firm:

a.     Attorney-1 learned from CC-1 that Developer-1 and Developer-2 were referred to the Real Estate Law Firm by SHELDON SILVER, the defendant. Attorney-1 also was aware that the Real Estate Law Firm paid SILVER 25% of the fees it obtained from Developer-1, and 15% of the fees it obtained from Developer-2.

b.     Attorney-1 was aware of attorney ethics rules that generally require fee share arrangements to be disclosed to clients. Attorney-1 believes that in or about 2009 the attorney ethics rules were modified to require fee share arrangements to be disclosed to clients in writing. Prior to 2009, Attorney-1 did not know whether CC-1 had disclosed the firm's fee share arrangements with SILVER to Developer-1 or Developer-2, and Attorney-1 had not made any such disclosures. In light of Attorney-1's belief, Attorney-1 told CC-1 that the Real Estate Law Firm should draft new retainer agreements with Developer-1 and Developer-2 that explicitly disclosed the fee share arrangements with SILVER. Nevertheless, over the next approximately two years, neither CC-1 nor Attorney-1 provided new retainer agreements to Developer-1 or Developer-2, nor were the firm's fee share arrangements with SILVER otherwise disclosed to Developer-1 or Developer-2 in writing.

20

c.    In or about late 2011, Attorney-1 became
concerned because Attorney-1 believed that the legislative
disclosure rules had changed such that SILVER might soon report on
his financial disclosure forms that he received outside income from
the Real Estate Law Firm, and Attorney-1 wanted the Real Estate Law
Firm's documents to be in order in the event of scrutiny.
Thereafter, in or about January 2012, the Real Estate Law Firm drafted
retainer agreements for Developer-1 and Developer-2 that disclosed
the Real Estate Law Firm's fee share arrangements with SILVER.

32.    I have learned the following from representatives of
and lobbyists for Developer-1, including the Lobbyists, and
Attorney-1, and documents obtained from Developer-1 and the Real
Estate Law Firm:

a.    Developer-1 owns several buildings in the
Assembly District of SHELDON SILVER, the defendant, as well as
buildings that benefit from the 80/20 and 421-a programs.  By at
least in or about 2000, SILVER, in part through contact with the
Lobbyists, had referred Developer-1 to the Real Estate Law Firm to
be retained for tax certiorari work for some of Developer-1's
buildings.  Prior to this retention, Developer-1 had retained law
firms other than the Real Estate Law Firm for its tax certiorari work,
but in light of the significant business Developer-1 had before the
State and to accommodate SILVER's request, Developer-1 agreed to move
some of its tax certiorari business to the Real Estate Law Firm.  Over
time, and with SILVER's knowledge, Developer-1 gave additional
business to the Real Estate Law Firm, so that by 2011, the Real Estate
Law Firm represented approximately 15 of Developer-1's buildings.

b.    In or about January 2012, the Real Estate Law
Firm sent retainer agreements to Developer-1 that disclosed in
writing that the Real Estate Law Firm was sharing its fees from
Developer-1 with SILVER, and stated that SILVER was jointly
representing Developer-1 with the Real Estate Law Firm in tax
certiorari matters.  SILVER had not disclosed to Developer-1
previously that the Real Estate Law Firm had paid him a share of the
fees that Developer-1 had paid to the Real Estate Law Firm.

c.    Developer-1 refused to sign the retainer
agreements as written.  However, after discussions through at least
one of the Lobbyists with SILVER, including a meeting between that
Lobbyist and SILVER in SILVER's legislative office, it was determined
that while the primary retainer agreements would not contain any
reference to SILVER, Developer-1 would sign a side letter (the "Side

21

Letter") concerning the Real Estate Law Firm's arrangement with
SILVER.  The Side Letter was addressed to SILVER and stated, in
relevant part, that the purpose of the letter "is to acknowledge that
you have assumed joint responsibility with our firm" for
representation of Developer-1's properties, and that "as agreed,"
SILVER would receive a "proportionate division of fees."  SILVER,
CC-1, and an authorized signatory of Developer-1 each signed the Side
Letter.  Following the Side Letter's signature by SILVER, CC-1, and
Developer-1, Developer-1 continued to have business before the
State, including before SILVER, and continued to retain the Real
Estate Law Firm, and the Real Estate Law Firm continued to pay SILVER
a portion of the fees it was paid by Developer-1.

       d.    Immediately prior to the Real Estate Law Firm's
written disclosure to Developer-1 of its fee share with SILVER, in
or about December 2011, SILVER contacted one of the Lobbyists to ask,
in sum and substance, whether – in connection with the Lobbyist's
activities lobbying SILVER with regard to legislation and other
matters before the Assembly – the Lobbyist was acting on behalf of
Developer-1 or "the LLCs" that nominally owned the buildings
ultimately owned by Developer-1.  The Lobbyist replied that he
represented Developer-1.  In response, SILVER indicated, in sum and
substance, that there was nothing to worry about, because he (i.e.,
SILVER), was only representing the LLCs.  Immediately after
receiving this call, the Lobbyist contacted Developer-1 through
another of its lobbyists because, in light of Developer-1's business
before the State, he was concerned and surprised that SILVER appeared
to have been getting money from Developer-1 through the Real Estate
Law Firm.[7]

       33.   I have learned the following from representatives of
Developer-2 and from Attorney-1, as well as from documents obtained
from Developer-2 and the Real Estate Law Firm:

       a.    Developer-2 is a real estate developer that owns
several properties in the Assembly District of SHELDON SILVER, the
defendant, and whose business is in part dependent on State

---

[7] The Lobbyist who provided this information has entered into an
agreement with the USAO SDNY that confirms his status as a fact witness, states
that he will not be prosecuted for the conduct described herein, and obligates
him to provide truthful information to and cooperate with the Government.  I
believe that the information attributed to this individual herein is reliable
because, among other things, it is corroborated by multiple other sources of
evidence.

governmental approvals for State tax abatement programs and other official actions taken by State officials, including SILVER.

        b.    In or about 2005, SILVER asked the owner of Developer-2 to hire the Real Estate Law Firm. SILVER stated, in sum and substance, that SILVER would appreciate it if Developer-2 would retain the Real Estate Law Firm for tax certiorari work on Developer-2's buildings. SILVER did not inform the owner of Developer-2 that if Developer-2 retained the Real Estate Law Firm, SILVER would receive a share of any fees Developer-2 paid to the Real Estate Law Firm. In light of the significant business Developer-2 had before the State, Developer-2 accommodated SILVER's request and moved certain of its tax certiorari business from other law firms to the Real Estate Law Firm.

        c.    In or about 2014, CC-1 contacted Developer-2 and disclosed to Developer-2 that the fees Developer-2 had been paying to the Real Estate Law Firm were being shared with SILVER. This was the first time Developer-2 learned of SILVER's fee share with the Real Estate Law Firm, and the owner of Developer-2 was extremely concerned about SILVER's receipt of its money, in part because of potential legal and ethical issues created by SILVER's receipt of funds from Developer-2.

        34.    I have learned from Attorney-1, who performs the vast majority of the Real Estate Law Firm's work for Developer-1 and Developer-2, that SILVER did not perform any legal work for Developer-1 or Developer-2. I also learned from Attorney-1 and my review of attorney disciplinary rules that an attorney is permitted to receive referral fees from a law firm not employing that attorney only in limited circumstances. In particular, at least since in or about 2009, Rule 1.5(g) of the New York Rules of Professional Conduct prohibited division of fees with a lawyer who is "not associated in the same law firm" unless, among other things, "the division is in proportion to the services performed by each lawyer or, by a writing given to the client, each lawyer assumes joint responsibility for the representation," and "the client agrees to employment of the other lawyer after a full disclosure that a division of fees will be made, including the share each lawyer will receive, and the client's agreement is confirmed in writing." Even before 2009, client consent was required, as was a written disclosure if the division of fees was not in proportion to the services performed by each lawyer. Under these rules, I respectfully submit that SILVER, who was not associated with the Real Estate Law Firm, was not permitted to earn attorney referral fees because he had no

23

responsibility for the legal representation of Developer-1 or
Developer-2, had performed no services for these clients, and with
the exception of the side letter referenced above, had never
acknowledged in writing that he played any role in the representation
or shared any fees with the Real Estate Law Firm.

35.   I have learned the following from individuals
employed by or lobbying on behalf of Developer-1, including the
Lobbyists, my review of records obtained from the Moreland
Commission, and public sources:

a.   In or about 2011, when the Real Estate
Legislation was last up for renewal, the Lobbyists met, on behalf
of Developer-1, with SILVER in his State office to advocate for
certain proposed terms for the new Real Estate Legislation.   The
legislation that was enacted included Developer-1's recommendations
in substantial part.

b.   A document obtained by the USAO SDNY from the
Moreland Commission, which was prepared by an entity that represents
real estate developers, stated in connection with the 2011 rent
regulation reauthorization that SILVER was considerably more
favorable to the real estate industry than expected.   Specifically,
the document states that "though he [SILVER] may never be the
owners['] advocate, given that the Governor wanted [certain
proposals] off the table and wanted to restore his reputation with
tenants, it would appear that he (Silver) could have successfully
pushed for more."

### SILVER'S CORRUPT RECEIPT OF ASBESTOS REFERRAL FEES

36.   I respectfully submit that there is probable cause
to believe that SHELDON SILVER, the defendant, obtained another
stream of corrupt payments by soliciting and obtaining asbestos
client referrals from Doctor-1 in exchange for directing State grants
to Doctor-1's research and undertaking other official actions on
behalf of Doctor-1 and his family.

37.   I have learned the following, in sum and substance,
from Doctor-1,[8] current and former DOH employees, and current and

---

[8] Doctor-1 has entered into an agreement with the USAO SDNY under which
he will not be prosecuted for the conduct described herein, and that obligates
him to provide truthful information to and cooperate with the Government.   I
believe that the information attributed to Doctor-1 herein is reliable because,
among other things, it is corroborated by multiple other sources of evidence.

former employees of University-1 and its affiliated hospital and from documents obtained from Doctor-1, University-1 and its affiliated hospital, DOH, and the Office of the New York State Comptroller ("OSC"), and from my training, experience, and participation in the investigation:

        a.    Doctor-1 is a well-known expert in the field of mesothelioma treatment and research. Doctor-1 treats mesothelioma patients and conducts mesothelioma research at University-1 and its affiliated hospital. By at least in or about 2002, Doctor-1 created a center at University-1 that was dedicated to mesothelioma research (the "Mesothelioma Center"). Because of his expertise, Doctor-1 treats many patients who come from outside the State.

        b.    Compared to most other forms of cancer, there is little funding for mesothelioma research, in part because the disease is rare, affecting only approximately 3,500 patients per year in the United States, and survival rates are low.

        c.    As funding is relatively scarce, certain mesothelioma researchers, including Doctor-1, have sought and received funding from law firms (or their affiliated foundations) that have earned large legal fees from the representation of individuals who suffer from mesothelioma. For many years, Doctor-1 served as a member of the scientific advisory board of a not-for-profit organization (the "Asbestos Organization") that sought and received such law firm funding for mesothelioma research. Doctor-1 knew from his work with the Asbestos Organization that Weitz & Luxenberg did not, as of 2003, financially support mesothelioma research.

        d.    Doctor-1 knew SHELDON SILVER, the defendant, through a mutual friend (the "Mutual Friend") who had worked in Albany and was friendly with SILVER.

        e.    Doctor-1 never had referred patients to Weitz & Luxenberg before SILVER joined the firm in 2002 in part because Doctor-1 believed the firm should support mesothelioma research and it had not done so.

        f.    Soon after learning that SILVER had joined Weitz & Luxenberg, Doctor-1 asked SILVER if Weitz & Luxenberg would fund mesothelioma research, and SILVER responded, in sum and substance, that the firm would not. Doctor-1 also informed SILVER, in sum and substance, that firms that represented patients with

25

asbestos-related diseases should financially support related medical research. Thereafter, Doctor-1 learned that SILVER wanted Doctor-1 to refer asbestos patients to SILVER at Weitz & Luxenberg.

        g.    Based on SILVER's request, Doctor-1 began to refer patients to SILVER at Weitz & Luxenberg. By making and continuing to make referrals to SILVER at Weitz & Luxenberg, Doctor-1 intended to create and maintain a relationship with SILVER through which Doctor-1 could and did make requests of and receive benefits from SILVER in his official capacity as Speaker of the Assembly, including State funding for Doctor-1's research.

        h.    Soon after Doctor-1 began referring patients to SILVER, SILVER communicated to Doctor-1, in sum and substance, that State funds potentially were available for Doctor-1's research and instructed Doctor-1 to write a letter to SILVER requesting State funds.

        i.    Pursuant to SILVER's suggestion, Doctor-1 drafted a letter to SILVER in which Doctor-1 requested that the State provide $250,000 to the Mesothelioma Center that Doctor-1 had established at University-1. Computer records show that the first draft of this letter was written on December 29, 2003, which Weitz & Luxenberg's records show was approximately seven weeks after Doctor-1 made his first patient referral to SILVER at Weitz & Luxenberg. The letter was addressed to SILVER at SILVER's District Office in lower Manhattan and was dated January 7, 2004.

        j.    After Doctor-1 had made initial referrals to SILVER, SILVER instructed Doctor-1 not to tell the Mutual Friend about the cases Doctor-1 was referring to SILVER.

        k.    On or about July 5, 2005, by letter from SILVER on Assembly letterhead sent to DOH, SILVER directed that a State grant in the amount of $250,000 be awarded to Doctor-1's Mesothelioma Center. In the letter, SILVER directed that the grant be paid for from the HCRA-Assembly Pool. The Legislative Initiative Form that accompanied the letter stated that the State money would support the general operating expenses of Doctor-1's Mesothelioma Center and attributed the request for funds, in part, to the need to study mesothelioma as result of the release of asbestos into the air on September 11, 2001 and for related outreach to residents of lower Manhattan, which is in SILVER's Assembly district. Neither the letter nor the accompanying Legislative Initiative Form mentioned

the fact that SILVER was benefiting financially from referrals of patients by Doctor-1 to SILVER.

l.       On or about July 12, 2005, Doctor-1 was informed by DOH that University-1's affiliated hospital had been awarded a State grant in the amount of $250,000 for the Mesothelioma Center (the "First $250,000 State Grant").  The First $250,000 State Grant was for the time period July 1, 2005 through June 30, 2006 and was funded through the HCRA-Assembly Pool.  As with other disbursements from the HCRA-Assembly Pool, DOH did not review the merits of the grant but simply processed the grant-related paperwork, including the grant contract and vouchers seeking payment against the grant.

m.       Based on Doctor-1's discussions with SILVER, in or about April 2006 and again in or about October 2006, Doctor-1 wrote letters to SILVER in which Doctor-1 requested an additional $250,000 in State funding for Doctor-1's Mesothelioma Center.

n.       On or about November 30, 2006, again by letter from SILVER on Assembly letterhead to DOH and accompanied by another Legislative Initiative Form, SILVER directed that a number of entities receive distributions from the HCRA-Assembly Pool.  Among the entities to which SILVER directed DOH to allocate funding from the HCRA-Assembly Pool was the Mesothelioma Center, in the same amount as the first State grant: $250,000.  The accompanying Legislative Initiative Form contained language identical to the Legislative Initiative Form that accompanied the July 2005 letter, including its reference to the use of funds to support research related to September 11 and outreach to residents and workers in lower Manhattan.

o.       On or about March 20, 2007, Doctor-1 was informed by DOH that University-1 had been awarded another State grant in the amount of $250,000 for the Mesothelioma Center (the "Second $250,000 State Grant").  The Second $250,000 State Grant was for the time period July 1, 2007 through March 31, 2008 and also was funded through the HCRA-Assembly Pool.  DOH issued and administered the Second $250,000 State Grant in the same manner as the First $250,000 State Grant.

p.       Despite the alleged connection between the $500,000 disbursed to the Mesothelioma Center and the events of September 11, which occurred in SILVER's Assembly district, SILVER never asked Doctor-1 how the State funds he had directed to the Mesothelioma Center actually were used.  I have been unable to locate

27

any public announcement or disclosure by SILVER of the State disbursements to the Mesothelioma Center.  As set forth above, SILVER was not required to disclose disbursements from the HCRA-Assembly Pool because the fund was, during its existence, off-budget or budgeted as a lump-sum appropriation whose ultimate beneficiaries were not required to be publicly disclosed.

q.    After the $500,000 in State funds had been received, Doctor-1 engaged in continued communications with SILVER about obtaining yet additional State funding for Doctor-1's research.  SILVER ultimately informed Doctor-1, in sum and substance, that the program under which the $500,000 in State grants to the Mesothelioma Center had been awarded had ended.[9]

r.    Commencing in or about 2010, Doctor-1 began receiving substantial support for his mesothelioma research from a foundation associated with another asbestos firm (the "Other Asbestos Firm"), which, like Weitz & Luxenberg, represented clients who suffered from mesothelioma.  By the time Doctor-1 began to receive funding from the Other Asbestos Firm, SILVER had directed no recent State funding to the Mesothelioma Center.  In part because the Other Asbestos Firm was providing funding for his research, Doctor-1 began referring cases to the Other Asbestos Firm.

s.    After Doctor-1 began to refer cases to the Other Asbestos Firm, SILVER visited Doctor-1 at University-1 and asked him why the number of patient referrals to him had decreased.  In response, Doctor-1 informed SILVER, in sum and substance, that he had fewer patients who were looking for legal representation, and that he had been referring patients who sought legal representation to the Other Asbestos Firm, which was supporting his research.

t.    Despite the relationship with the Other Asbestos Firm, Doctor-1 continued to refer cases to SILVER at Weitz & Luxenberg, including after 2010.  Doctor-1 made these referrals, in part, to maintain a relationship with SILVER through which Doctor-1 could and did make requests of and receive benefits from SILVER in his official capacity as Speaker of the Assembly, and SILVER

---

[9] Based on information set forth above, I know that SILVER's statement to Doctor-1 that the program under which the $500,000 was disbursed had ended coincided with the elimination of the HCRA-Assembly Pool and other lump-sum appropriations in 2007.  Nothing prohibited SILVER after that date from disbursing itemized appropriations in the form of publicly identifiable member items to the Mesothelioma Center.  Any such member items, however, unlike the appropriations from the HCRA-Assembly Pool, would have been subject to public disclosure.

28

in turn used his official position to provide certain benefits to
Doctor-1 and his family, including, but not limited to, the
following:

i.     In or about 2008, SILVER helped direct
$25,000 in State funding to a not-for-profit organization on which
a family member of Doctor-1 served as a member of its Board of
Directors.   In or about May 2008, the organization thanked Doctor-1
and his family member for their help "obtaining funds from
Assemblyman Silver."

ii.    In or about May 2011, SILVER sponsored and
obtained an official resolution issued by the Legislature honoring
Doctor-1, which SILVER presented to Doctor-1 at an event held by a
nationwide cancer organization in Manhattan.   During the
presentation, SILVER made remarks in his official capacity praising
Doctor-1.

iii.   In or about 2012, Doctor-1 contacted
SILVER to request that SILVER assist another family member of
Doctor-1 in finding a job.   SILVER helped arrange for Doctor-1's
family member to be interviewed by a not-for-profit organization (the
"Nonprofit Organization") that received millions of dollars in
member items and capital funding from SILVER.   I have learned from
the head of the Nonprofit Organization that when SILVER asked for
help in securing a job for Doctor-1's family member, it was the first
and only time SILVER asked the Nonprofit Organization to consider
hiring anyone.   Following SILVER's referral, Doctor-1's family
member was hired by the Nonprofit Organization.

### *SILVER's Personal Financial*
### *Benefits from His Official Acts for Doctor-1*

38.   I have learned the following from the two founding
partners of Weitz & Luxenberg ("Partner-1" and "Partner-2"), the
attorneys who lead Weitz & Luxenberg's asbestos practice (the
"Asbestos Attorneys"), and the firm's Managing Attorney
(collectively, the "Weitz & Luxenberg Attorneys"), and from records
of Weitz & Luxenberg:

a.     Weitz & Luxenberg is a law firm with its primary
offices located in Manhattan.   The firm specializes in representing
plaintiffs in mass tort cases, with a particular focus on cases
involving asbestos exposure and mesothelioma, and it files hundreds
of asbestos exposure and mesothelioma cases in New York each year.

b.     Weitz & Luxenberg derives more than 60 percent of its revenue from asbestos cases, with mesothelioma being among the most lucrative of those cases because of, among other things, the disease's clear causal link with asbestos exposure, pain and suffering caused by the disease, the availability of funds to compensate plaintiffs suffering from the disease, and Weitz & Luxenberg's expertise.

c.     In or about September 2002, SHELDON SILVER, the defendant, was hired by Weitz & Luxenberg as "of counsel" at an annual salary of $120,000.  At the time SILVER joined Weitz & Luxenberg, SILVER had no prior experience with asbestos cases, and he brought no cases, matters, or clients of any kind with him to the firm.

d.     According to Partner-1, Weitz & Luxenberg hired SILVER, and paid him $120,000 per year in base compensation, because of his official position and stature and without the expectation that SILVER would perform any work on cases or refer any cases to the firm. Specifically, Partner-1 hoped that Weitz & Luxenberg's association with SILVER would increase the firm's prestige and perceived power. Neither Partner-1 nor Partner-2 knew SILVER well before SILVER joined Weitz & Luxenberg in 2002.

e.     As it provided to other non-partner attorneys, Weitz & Luxenberg provided SILVER with the opportunity to obtain additional income through referral fees.  Accordingly, SILVER was entitled to receive 33 percent of the firm's share of any recovery obtained on behalf of an asbestos-related client whom SILVER referred to the firm, and up to 50 percent of the firm's share of any recovery obtained on behalf of any negligence client whom SILVER referred to the firm.

f.     Soon after SILVER joined Weitz & Luxenberg, SILVER began receiving referrals of asbestos cases from Doctor-1, and he has received numerous referrals of asbestos cases from Doctor-1 since that time.

g.     Except for one or two isolated referrals, the Weitz & Luxenberg Attorneys are unaware of any source of asbestos-related referrals to SILVER other than Doctor-1.  Prior to referring patients to SILVER, Doctor-1 had not referred any patients to Weitz & Luxenberg.

h. The Weitz & Luxenberg Attorneys did not know how it came about that Doctor-1 began and continued to refer patients to SILVER. SILVER never told the Weitz & Luxenberg Attorneys that he was going to allocate, or had allocated, any State funding to Doctor-1's research or to asbestos-related research generally. Nor did SILVER ever state to the Weitz & Luxenberg Attorneys that he had taken or was taking any action to benefit Doctor-1 or his family.

i. Several years ago, Partner-2 noticed that the number of asbestos-related referrals that SILVER was receiving from Doctor-1 had decreased. Partner-2 inquired with SILVER, who stated, in sum and substance, that the Other Asbestos Firm had contributed money to Doctor-1's research, and that, as a result, Doctor-1 had begun referring patients to the Other Asbestos Firm. SILVER further informed Partner-2 that he was confident that Doctor-1 would continue to refer additional patients to him, although he did not explain the source of this confidence.

j. Until in or about 2011, Weitz & Luxenberg, and Partner-1 and Partner-2 personally, contributed only nominal amounts to mesothelioma research. Neither Weitz & Luxenberg, nor the firm's attorneys, ever have contributed to Doctor-1's research.

k. When SILVER received an asbestos referral, he contacted one of the Asbestos Attorneys to provide the potential client's name, phone number, and, in some cases, a brief description of the matter. The firm then contacted the individual named in the referral by telephone from the firm's offices in Manhattan to evaluate the case. Several of these telephone calls were interstate telephone calls. After clients retained Weitz & Luxenberg, they engaged in regular contact with the firm by interstate telephone calls (with respect to the out-of-state clients) If the individual became a client of the firm, SILVER received referral fee credit.

l. SILVER did not evaluate or perform work on asbestos cases, including clients he referred to Weitz & Luxenberg through Doctor-1, because, among other reasons, he lacked the knowledge and experience necessary to evaluate those cases. SILVER had no known contact with clients in asbestos cases, and he did not consult with the Weitz & Luxenberg Attorneys about asbestos cases, other than on limited occasions to ask about the status of specific cases and payouts therefrom.

m. Other than the single matter representing a legislative employee referenced above, SILVER has not performed any

31

substantive legal work at Weitz & Luxenberg, including on those matters that he refers to the firm.

n.   SILVER is given referral fee credit, and receives referral fees multiple times per year, by check based on asbestos cases referred to the firm by Doctor-1.   SILVER received his first referral attributable to Doctor-1 in or about November 2003.   SILVER began receiving referral fees from asbestos cases in or about February 2005.   Records reflect that SILVER has received and continues to receive referral fees arising from asbestos referrals, the most recent one of which I am aware being in or about November 2014.

o.   The dollar amount of asbestos referral fees paid to SILVER by Weitz & Luxenberg likely is to increase because several of the asbestos cases referred to SILVER by Doctor-1 have not yet been fully resolved.

### SILVER'S EFFORTS TO CONCEAL HIS CORRUPT SOURCES
### OF OUTSIDE INCOME FROM THE PUBLIC AND THE MORELAND COMMISSION

39.   Based on the information set forth above, I respectfully submit that the representations of SHELDON SILVER, the defendant, to the public in his Disclosure Forms and in public statements about the sources of his outside income consistently have been materially false and misleading in that, among other things, SILVER failed to disclose that he was receiving income from the Real Estate Law Firm; failed to disclose that the vast majority of his income from Weitz & Luxenberg was derived from asbestos cases on which he performed no legal work and that he received through the use of his official position rather than because of any potential client's interest in having SILVER represent him or her; and failed to disclose that his clients at the Real Estate Law Firm have had and continue to have business before the State.   In addition, SILVER made numerous affirmative misrepresentations about the nature of his private law practice and the sources of his outside income as described in greater detail above.

40.   In addition to concealing his corrupt sources of outside income from the public, SHELDON SILVER, the defendant, also took actions to conceal his corrupt sources of outside income from the Moreland Commission.   I have learned the following from my review of publicly available State government documents and State court filings and records received by the USAO SDNY from the Moreland Commission and from members of the Moreland Commission and its staff,

32

representatives of the Office of the Governor, and the Weitz & Luxenberg Attorneys, and from my training, experience, and participation in the investigation:

          a.    On or about July 2, 2013, the Governor of the State appointed the Moreland Commission.  According to the Governor's public statements announcing the formation of the Moreland Commission, the Moreland Commission was established "to probe systemic corruption and the appearance of such corruption in state government, political campaigns and elections in New York State."  The Governor's press release specifically stated that the Commission would "have the power to subpoena and examine witnesses under oath as well as subpoena any necessary records."  The Commission was scheduled to last approximately 18 months and issue a "preliminary policy report" on December 1, 2013 and "any additional report(s)" by January 1, 2015.

          b.    Part of the Moreland Commission's investigation included outside income earned by members of the Legislature.  In connection with that facet of its investigation, the Moreland Commission wrote letters to members of the Assembly and the Senate, including SHELDON SILVER, the defendant, requesting, among other things, "a description of the services you provide or have provided in exchange for compensation," and "a list of your clients in any civil matters."  While some legislators voluntarily complied with the request, SILVER refused to do so.  After SILVER refused to comply with the letter request, the Moreland Commission subpoenaed Weitz & Luxenberg, as well as other entities that employed legislators who had refused to comply with the letter requests, for information about the non-complying legislators' outside income.

          c.    The subpoena to Weitz & Luxenberg specifically sought records concerning "CLIENTS advised or represented by Assembly Speaker Sheldon Silver, and a general description of the services provided by Assembly Speaker Sheldon Silver to such CLIENTS."  (Emphasis in original.)

          d.    After Weitz & Luxenberg received the Moreland Commission subpoena, SILVER caused the Assembly to file a motion in New York State Supreme Court to quash the Moreland Commission's subpoenas related to Assembly Members' outside income, including the subpoena to Weitz & Luxenberg.  This and other legal actions by the Assembly to quash the subpoenas were taken at taxpayers' expense. Weitz & Luxenberg, after discussions with SILVER, also filed its own motion to quash the subpoena.  The Moreland Commission filed a

response asking that the court order the subpoenaed entities, including Weitz & Luxenberg, to produce to the Moreland Commission the requested documents related to outside income.

               e.    On or about February 25, 2014, in statements made at a press conference, SILVER claimed that by subpoenaing information about legislators' outside income, the Moreland Commission was "engaged in a fishing expedition to intimidate legislators" and had exceeded its mandate and otherwise abused its power.

               f.    On or about March 29, 2014, the Governor announced that, as part of the budget negotiations, he had agreed to end the Moreland Commission, and in exchange, the Legislature had agreed to certain changes to campaign finance reporting requirements and bribery laws, and to experiment with public financing of elections in that year's race for State Comptroller. SILVER and his Assembly staff were key participants in these negotiations and prior discussions of these issues, including advocating against the Moreland Commission's formation and continued existence and arguing against limits to legislators' outside income and related disclosure requirements. At the time of the Governor's announcement, the motions to quash the Moreland Commission subpoenas relating to outside income as described above were pending. No changes were made with respect to the ability of legislators to receive outside income or with respect to the disclosures required about the nature of such outside income.

               g.    On or about April 10, 2014, the USAO SDNY requested and received from the Moreland Commission its files and documents, including documents related to its investigation of legislators' outside income. Certain of these documents and leads contained therein are reflected in this Complaint.

               41.    On or about April 22, 2014, the New York State Attorney General, on behalf of the Moreland Commission, filed a letter in New York State Supreme Court withdrawing the subpoenas related to outside income and requesting that the pending motions be dismissed, citing the fact that the Governor had disbanded the Commission and its staff.

34

42.  Based on the evidence set forth above, I respectfully submit that there is probable cause to believe that SHELDON SILVER, the defendant, has engaged in and continues to engage in a secret and corrupt scheme to deprive the citizens of the State of his honest services, and to extort individuals and entities under color of official right, and has conspired to do the same, in violation of Title 18, United States Code, Sections 1341, 1343, 1346, 1349, and 1951.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SHELDON SILVER, the defendant, and that he be imprisoned or bailed, as the case may be.

ROBERT W. RYAN
Criminal Investigator
United States Attorney's Office
Southern District of New York

Sworn to before me this
21st day of January, 2015

THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                :

UNITED STATES OF AMERICA         :    <u>SUPERSEDING INDICTMENT</u>

       - v. -         :    S1 15 Cr. 093 (VEC)

                :

SHELDON SILVER,            :

       Defendant.      :

- - - - - - - - - - - - - - - - x

The Grand Jury charges:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    APR 2 3 2015

## Background

### *Silver's Official Powers in the Assembly*

1.    For more than 20 years, from in or about 1994 until in or about February 2015, SHELDON SILVER, the defendant, served as Speaker of the New York State Assembly (the "Assembly"), which is one of the two houses of the New York State Legislature (the "Legislature"). From in or about 1977 through the present, SILVER has been an elected member of the Assembly, representing an Assembly District that comprises much of lower Manhattan.

2.    As Speaker of the Assembly, SHELDON SILVER, the defendant, exercised significant power, including but not limited to presiding over the Assembly and controlling legislative sessions by, among other things, determining whether certain legislation was brought to the floor for debate and otherwise setting the priorities and direction of the Assembly. SILVER also represented the Assembly in negotiations with the Governor of the

State of New York and the Majority Leader of the New York State
Senate concerning the budget of the State of New York (the "State")
and other important legislative and other matters pending before
the State, including legislation critical to the real estate
industry.  In addition, and as set forth in more detail below, as
Speaker of the Assembly, SILVER exercised power over allocation
of certain State funds.

     3.    SHELDON SILVER, the defendant, also has performed
various constituent services both as Speaker of the Assembly for
citizens of the State and as a representative of his Assembly
District for residents of the District.  Such services include but
are not limited to assistance related to governmental programs and
funding, and referrals for professional and other private
services, employment, and programs.

**Silver's Public Representations about His Outside Income**

     4.    As an elected State legislator, SHELDON SILVER,
the defendant, was required by law to file financial disclosure
statements on an annual basis with the New York State Legislative
Ethics Commission (the "Ethics Commission").  The financial
disclosure statement, entitled "Annual Statement of Financial
Disclosure" (the "Disclosure Form"), required sitting legislators
to disclose details about their outside income, activities,
finances, and assets so that, among other things, a financial

2

impropriety or conflict of interest could be detected. More specifically, at all times relevant to this Indictment, the Disclosure Form required legislators to disclose "completely" the "nature and amount of any income in EXCESS of $1,000 from EACH SOURCE," and, for legislators who had outside income as attorneys, to provide a "general description of the principal subject areas" of their practice.

    5.   On the Disclosure Forms of SHELDON SILVER, the defendant, covering the years 2002 through 2013, SILVER described his law practice as representing "individual clients" in the "predominant area" or "principal subject area" of "personal injury claims." SILVER reported receiving income from serving as "of counsel" to the law firm Weitz & Luxenberg, P.C. ("Weitz & Luxenberg"), but he did not identify receiving income from any other law firm.

    6.   In addition to the statements made on his annual Disclosure Forms, SHELDON SILVER, the defendant, made the following public representations, among others, about the nature and sources of his outside income:

        a.   SILVER claimed that his private legal work consisted of spending several hours each week evaluating legal matters brought to him by potential clients and then referring

those individuals whose matters appeared to have merit to attorneys at Weitz & Luxenberg.

> b. SILVER claimed that potential clients found SILVER or were recommended to SILVER by virtue of his being a "lawyer for 40 years," and that SILVER represented only "individuals who through some unfortunate circumstance [have been] injured" and "call[] upon [SILVER] to represent them."

> c. SILVER repeatedly claimed that his outside legal work was not connected to his official position or to State government, that he did not "represent any corporations," "entities that are involved in the legislative process," or "anybody who in any way ha[d] an impact on what [the Assembly does] legislatively," that none of his clients had any business before the State, and that the clients he represented had "nothing to do with the political life at all."

## Overview of Silver's Criminal Conduct

> 7. From at least in or about 2000 up to and including in or about January 2015, SHELDON SILVER, the defendant, engaged in a secret and corrupt scheme to deprive the citizens of the State of his honest services as an elected legislator and as Speaker of the Assembly and to extort others under color of official right by using the power and influence of his official position to obtain for himself millions of dollars in bribes and kickbacks and

4

extortion payments masked as legitimate income earned by SILVER as a private lawyer.

8.    More specifically, from at least in or about 2000 through in or about January 2015, SHELDON SILVER, the defendant, received nearly $4 million in illegal payments through two law firms, consisting of the following:

a.    Approximately $700,000 in illegal payments that SILVER received through a real estate law firm (the "Real Estate Law Firm") in exchange for using his official position to obtain recurring tax certiorari legal claims (the "Tax Certiorari Business") of real estate developer clients with substantial business before the State for the Real Estate Law Firm.

b.    More than $3 million in illegal payments that SILVER received through Weitz & Luxenberg in exchange for using his official position to obtain the names and identifying information of unrepresented patients with mesothelioma (the "Mesothelioma Leads"), and the valuable legal claims connected thereto, from a doctor ("Doctor-1") to whose research SILVER secretly directed $500,000 in State funds and for whose benefit SILVER engaged in other official acts.

9.    In furtherance of his corrupt scheme and to enable the scheme to continue without detection, SHELDON SILVER, the defendant, repeatedly took actions and used his official position

5

to prevent the public, investigators, and others from learning about his corrupt scheme. For example, SILVER made materially false and fraudulent representations and omissions about his outside income, including but not limited to SILVER's public statements, statements on his Disclosure Forms, and statements to others concerning his outside income. In addition, from in or about 2013 to in or about 2014, SILVER sought to prevent, and in fact prevented, the disclosure of information about his outside income to the Moreland Commission to Investigate Public Corruption (the "Moreland Commission"), which was created in or about July 2013 by the Governor "to probe systemic corruption and the appearance of such corruption in state government, political campaigns and elections in New York State."

**Means and Methods of Silver's Fraudulent Scheme**

***Silver's Receipt of Illegal Payments Through the Real Estate Law Firm***

10. As an elected legislator and as Speaker of the Assembly, SHELDON SILVER, the defendant, has exercised significant power over the real estate industry, including but not limited to considering, negotiating, and enacting legislation that created and maintained certain governmental programs, subsidies, and tax incentives of importance to the industry.

11. The Real Estate Law Firm is located in the Assembly District of SHELDON SILVER, the defendant. Its practice consists

almost exclusively of representing property owners that contest
the assessment of the value of their properties in an effort to
lower the real estate taxes imposed on them, a practice referred
to as tax certiorari work.  The Real Estate Law Firm is controlled
by an attorney who previously had worked as SILVER's counsel in
the Assembly (the "Real Estate Lawyer").  At all times relevant
to this Indictment, the Real Estate Law Firm had only two attorneys
who worked for it, namely, the Real Estate Lawyer and another
attorney.  Like others in the tax certiorari industry, the Real
Estate Law Firm billed its clients on a contingency fee basis,
typically obtaining as a fee up to 25 percent of any tax reductions
it obtained on behalf of its clients.

12.  Beginning at least in or about 2000, SHELDON
SILVER, the defendant, used the power and influence of his official
position to obtain Tax Certiorari Business of two real estate
developers ("Developer-1" and "Developer-2"), both of which had
significant business before the State and owned properties located
within SILVER's Assembly District, for the Real Estate Law Firm.
In exchange and in return for SILVER's use of his official
position, SILVER obtained hundreds of thousands of dollars in
illegal payments through the Real Estate Law Firm that were
disguised as attorney referral fees.

13.   In exchange for his receipt of illegal payments
through the Real Estate Law Firm, SHELDON SILVER, the defendant,
took numerous actions under the color of his official authority
and in his official capacity as an elected legislator and as
Speaker of the Assembly as the opportunities arose, including but
not limited to the following:

a.   Even though SILVER had no background in real
estate tax certiorari work, no experience performing or evaluating
such work, and no intention of performing such work, SILVER
obtained Tax Certiorari Business of Developer-1 and Developer-2,
whose businesses depended in part on obtaining favorable official
action from SILVER, for the Real Estate Law Firm.   Neither
Developer-1 nor Developer-2 had retained or considered retaining
the Real Estate Law Firm previously, and both moved Tax Certiorari
Business to the Real Estate Law Firm from law firms they had been
using for such work.

b.   During times relevant to this Indictment,
SILVER spoke and met in his legislative office with
representatives of and lobbyists for Developer-1 – who were
retained in part to lobby SILVER – about certain real estate
governmental programs, subsidies, and tax incentives and the
representation of Developer-1's buildings by the Real Estate Law
Firm.

8

c. During times relevant to this Indictment, SILVER met with a representative of Developer-2 and discussed real estate matters of importance to Developer-2.

d. SILVER supported legislative proposals favorable to Developer-1 and Developer-2, including but not limited to proposals made by lobbyists for Developer-1 with respect to the Rent Act of 2011.

e. Based on SILVER's past favorable official actions concerning Developer-1 and Developer-1's dependence on continued favorable treatment by SILVER, in or about late 2011 through early 2012, Developer-1 continued to retain the Real Estate Law Firm by executing a side agreement with SILVER and the Real Estate Law Firm.

f. Through SILVER's appointment as Speaker of the Assembly to the State Public Authority Control Board (the "PACB"), SILVER had oversight and approval power over certain tax subsidized loans that were sought by and granted to Developer-1.

14. At the Real Estate Lawyer's direction, the Real Estate Law Firm paid SHELDON SILVER, the defendant, often multiple times per year, a percentage of the fees it obtained from Developer-1 and Developer-2. During times relevant to this Indictment, the Real Estate Law Firm paid SILVER nearly $700,000. During that time period, and at all times relevant to this

9

Indictment, SILVER performed no work for the Real Estate Law Firm
whatsoever, including in connection with the firm's
representation of Developer-1 and Developer-2.

15. In furtherance of the fraudulent scheme, the
United States mail and private and commercial interstate carriers
and interstate wires were used and caused to be used, including
but not limited to mailings sent and received and interstate
electronic mail, telephone calls, and wire transfers of funds
between, among other individuals and entities, the Real Estate Law
Firm, SHELDON SILVER, the defendant, Developer-1, and
Developer-2.

### Silver's Receipt of Illegal Asbestos Payments

16. As Speaker of the Assembly, SHELDON SILVER, the
defendant, exercised control over a pool of money that was
available to the Assembly until in or about 2007 under legislation
entitled the New York State Health Care Reform Act ("HCRA").
Specifically, until in or about 2007, up to $8.5 million was
allocated to the Assembly annually under HCRA, to be disbursed
through the New York State Department of Health ("DOH") at the
discretion of the Speaker of the Assembly, i.e., SILVER (the
"HCRA-Assembly Pool").

17. Disbursements from the HCRA-Assembly Pool were not
subject to public disclosure. To disburse funds from the

10

HCRA-Assembly Pool, a letter from SHELDON SILVER, the defendant, was sent to DOH, accompanied by a form called a Legislative Initiative Form, which provided the purported intended purpose of the disbursement. DOH had no role in selecting recipients of the HCRA-Assembly Pool funds or evaluating the intended use of such funds. Thus, SILVER was able to distribute money from the HCRA-Assembly Pool at his discretion, with no public disclosure of the disbursement, its recipient, or its intended purpose.

18. At all times relevant to this Indictment, Doctor-1 was a well-known expert in the treatment and research of mesothelioma, a cancer that is caused almost exclusively by asbestos. Doctor-1 treated mesothelioma patients and conducted mesothelioma research at a university located in Manhattan ("University-1") and its affiliated hospital. Doctor-1 also created a center at University-1 that was dedicated to mesothelioma research (the "Mesothelioma Center").

19. Weitz & Luxenberg has several practice areas, including personal injury, malpractice, and products liability. One of the firm's principal areas of focus is representing plaintiffs who suffer from asbestos-related diseases such as mesothelioma. As mesothelioma cases are extremely lucrative, law firms that practice in this area, including Weitz & Luxenberg,

spend considerable amounts of money to obtain leads to potential clients with mesothelioma.

20.   In or about September 2002, Weitz & Luxenberg hired SHELDON SILVER, the defendant, to be "of counsel" to the firm with an annual salary of $120,000.   Weitz & Luxenberg hired SILVER because of his official position and stature and without the expectation that SILVER would perform any work on cases, or that he would refer any asbestos cases to the firm.   Indeed, at the time SILVER joined Weitz & Luxenberg, SILVER had no prior experience with asbestos cases, and he brought no cases, matters, or clients of any kind with him to the firm.

21.   In addition to his salary, SHELDON SILVER, the defendant, was able to obtain additional income from Weitz & Luxenberg by referring matters to the firm.   In particular, if SILVER referred a client with an asbestos-related claim to the firm, he was entitled to receive 33 percent of the firm's share of any recovery obtained by the firm on behalf of such client.

22.   Beginning in or about late 2003 through at least in or about August 2014, SHELDON SILVER, the defendant, engaged in a corrupt scheme whereby Doctor-1, at SILVER's request, provided Mesothelioma Leads, and the valuable legal claims connected thereto, to SILVER at Weitz & Luxenberg, and in exchange, SILVER used the power and influence of his official position to

12

benefit Doctor-1, including by providing State funding to Doctor-1's Mesothelioma Center and providing other benefits to Doctor-1 and his family.

23. Doctor-1 obtained the Mesothelioma Leads and sent the valuable legal claims connected thereto to SHELDON SILVER, the defendant, at Weitz & Luxenberg in the following manner: Doctor-1 spoke with his mesothelioma patients (and family members who were present) who did not have legal representation and, after obtaining patient consent, sent them to Weitz & Luxenberg by, among other things, providing the Mesothelioma Leads to SILVER, who in turn provided the Mesothelioma Leads to attorneys at Weitz and Luxenberg to evaluate and pursue the patients' legal claims. In exchange for the Mesothelioma Leads, and the valuable legal claims connected thereto, SILVER took numerous actions under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose, including but not limited to the following:

a. In or about July 2005, SILVER directed that a State grant in the amount of $250,000, paid for from the HCRA-Assembly Pool, be awarded to Doctor-1's Mesothelioma Center, and pursuant to SILVER's direction, the grant was awarded.

b. In or about November 2006, SILVER directed that another State grant in the amount of $250,000, again paid for

13

from the HCRA-Assembly Pool, be awarded to Doctor-1's Mesothelioma

Center, and pursuant to SILVER's direction, the grant was awarded.

        c.    In or about 2008, SILVER helped direct

$25,000 in State funding to a not-for-profit organization on which

a family member of Doctor-1 served as a member of its Board of

Directors.

        d.    In or about May 2011, SILVER sponsored and

obtained an official resolution adopted by the Assembly and an

Assembly-issued proclamation honoring Doctor-1, which SILVER

presented to Doctor-1 at an event at which Doctor-1 was honored

by a nationwide cancer organization in Manhattan.  During the

presentation, SILVER made remarks in his official capacity

praising Doctor-1.

        e.    In or about 2012, SILVER facilitated

employment for a family member of Doctor-1 at a not-for-profit

organization to which SILVER had directed millions of dollars in

State funding.

        24.    The Mesothelioma Leads, and the valuable legal

claims connected thereto, sent by Doctor-1 to SHELDON SILVER, the

defendant, were highly lucrative for SILVER.  Specifically, Weitz

& Luxenberg paid SILVER more than $3 million in referral fees for

cases referred to him by Doctor-1.  With respect to these cases,

SILVER did not evaluate the matters; he performed no work on the

14

matters; he had no contact with the clients; and he did not advise the Weitz & Luxenberg attorneys assigned to the matters.

25. In furtherance of the fraudulent scheme, the United States mail and private and commercial interstate carriers and interstate wires were used and caused to be used, including but not limited to mailings sent and received and interstate electronic mail, telephone calls, and wire transfers of funds between, among other individuals and entities, Weitz & Luxenberg and clients referred to SHELDON SILVER, the defendant, by Doctor-1.

### Silver's Concealment of His Criminal Conduct

26. As part of his corrupt scheme and to avoid detection by the public, his staff, colleagues, and associates, State regulators, law enforcement, and others, SHELDON SILVER, the defendant, took numerous steps to conceal his illegal conduct, including but not limited to the following:

a. SILVER made materially false and fraudulent representations and omissions on the mandatory Disclosure Forms he filed with the Ethics Commission. Among other things, SILVER failed to disclose that he received income from the Real Estate Law Firm and failed to disclose that the vast majority of his income from Weitz & Luxenberg was derived not from "the predominant area of personal injury claims" – as he stated on the forms – but rather

from asbestos-related product liability cases on which he performed no legal work and that he received through the use of his official position.

      b.   SILVER lied to and misled the public about the nature and sources of his outside legal income by, among other things, claiming that none of his clients had any business before the State when, in truth and in fact, he represented and was receiving hundreds of thousands of dollars from large real estate developers with substantial business before the State.

      c.   SILVER further lied to and misled the public about the nature and sources of his outside legal income by claiming that he derived outside income through individuals who sought him out for legal services and that he spent several hours each week evaluating legal matters brought to him by potential clients.  In truth and in fact, Developer-1, Developer-2, and patients of Doctor-1 did not seek out SILVER for legal representation, and SILVER did not evaluate either the tax certiorari matters from which he received fees from the Real Estate Law Firm or the asbestos matters sent to him by Doctor-1.

      d.   SILVER went to great lengths to prevent others, including his staff, colleagues, and associates, from learning about the true nature of his relationship with Doctor-1 and that he was receiving referral fees from the Real Estate Law

16

Firm's representation of Developer-1 and Developer-2. Among other ways of concealing his corrupt scheme, SILVER:

          i.      Kept secret from attorneys at Weitz & Luxenberg that he had directed State funding to Doctor-1's research and used his official position to provide other benefits to Doctor-1 and his family;

          ii.     Kept secret from his legislative staff that he was receiving referral fees from the Real Estate Law Firm and case referrals from Doctor-1;

          iii.    Instructed Doctor-1 not to tell a mutual friend who had first introduced SILVER and Doctor-1 about Doctor-1's referrals of cases to SILVER; and

          iv.     Used undisclosed State funds, namely the HCRA-Assembly Pool, to provide grants to Doctor-1's research, and stopped providing such grants when the HCRA-Assembly Pool was eliminated and other possible sources of State funding would have been subject to public disclosure.

       27.   SHELDON SILVER, the defendant, took actions to conceal his corrupt sources of outside income from the Moreland Commission. After the Moreland Commission sent letters to certain members of the Assembly and the Senate, including to SILVER, requesting, among other things, "a description of the services you provide or have provided in exchange for

17

compensation," and "a list of your clients in any civil matters,"
SILVER refused to provide the requested information.  When the
Moreland Commission then subpoenaed Weitz & Luxenberg, as well as
other entities that employed legislators who had refused to comply
with the letter requests, for information about the non-complying
legislators' outside income, SILVER caused the Assembly, at
taxpayer expense, and Weitz & Luxenberg to file motions in New York
State Supreme Court to quash the subpoenas.  On or about February
25, 2014, in statements made at a press conference, SILVER claimed
that by subpoenaing information about legislators' outside
income, the Moreland Commission was "engaged in a fishing
expedition to intimidate legislators" and had exceeded its mandate
and otherwise abused its power.  Subsequently and while the
motions to quash the subpoenas were pending, SILVER participated
in State budget negotiations that resulted in, among other things,
the shutdown of the Moreland Commission, and the subpoenas seeking
information on outside income were withdrawn.

### Silver's Illicit Transactions with His Crime Proceeds

28.  Based on the illegal conduct set forth above,
SHELDON SILVER, the defendant, amassed nearly $4 million in crime
proceeds from both the Real Estate Law Firm and through asbestos
referral fees paid to him by Weitz & Luxenberg.  SILVER deposited
nearly all of these crime proceeds into a single account at a

18

financial institution in the name of "Sheldon Silver, Counselor at Law" (the "Silver Account"), thereby commingling his ill-gotten gains from both the Real Estate Law Firm and Weitz & Luxenberg. In addition, SILVER deposited his salary from Weitz & Luxenberg into the Silver Account, thereby commingling crime proceeds with funds not derived from the corrupt scheme.

29. By in or about 2006, the Silver Account held hundreds of thousands of dollars obtained by SHELDON SILVER, the defendant, and additional substantial criminal proceeds were expected. Rather than continue to maintain these funds in the Silver Account, SILVER used his relationship with an investor ("Investor-1"), who had access to private, high-yield investment opportunities, to distribute his crime proceeds across numerous high-yield investment vehicles not available to the general public.

30. More specifically, in or about 2006, at the request of SHELDON SILVER, the defendant, Investor-1 provided access to a private investment vehicle that promised a high annual rate of return with little risk ("Investment Vehicle-1"). In connection with Investment Vehicle-1, SILVER engaged in a series of transactions through financial institutions involving property greater than $10,000. Thereafter up to and including in or about January 2015, SILVER continued to obtain access to other

19

potentially high-yield private investments through Investor-1, by engaging in additional transactions through financial institutions involving property greater than $10,000.

31. SHELDON SILVER, the defendant, did not pay any fee or remuneration to Investor-1 for Investor-1's provision of advice regarding and access to the high-yield private investments although SILVER took certain official actions as requested by Investor-1. At no time did SILVER truthfully disclose to Investor-1 or the Investment Vehicle-1 the source and origin of the funds that SILVER provided for these investments.

32. In or about 2011, in anticipation of a change in law requiring State legislators to more fully disclose to the public the amount of their outside income, investments, and loans, SHELDON SILVER, the defendant, transferred more than $340,000 of his investment in Investment Vehicle-1 into the name of a family member, thereby avoiding future disclosure to the public of the full amount of his investment. By January 2015, SILVER had transferred approximately $642,000 from the Silver Account to Investment Vehicle-1, which had grown to a value of more than $1.4 million.

20

## Statutory Allegations

### COUNT ONE

### (Honest Services Mail Fraud: Asbestos Payments)

33. From at least in or about 2003 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, any such matter and thing, to wit, SILVER used the power and influence of his official position to obtain millions of dollars in bribes and kickbacks in the form of referral fees paid to him through Weitz & Luxenberg, and in connection therewith and in furtherance thereof, SILVER

21

sent and received and caused materials to be sent and received using the United States mail and private and commercial interstate carriers.

(Title 18, United States Code, Sections 1341, 1346, and 2.)

## COUNT TWO

**(Honest Services Wire Fraud:  Asbestos Payments)**

The Grand Jury further charges:

34. The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

35. From at least in or about 2003 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SILVER used the power and influence of his official position to obtain millions of dollars in bribes and kickbacks in the form of referral fees paid to him through Weitz & Luxenberg, and in connection therewith and in

22

furtherance thereof, SILVER transmitted and caused to be transmitted interstate electronic mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

## COUNT THREE

**(Honest Services Mail Fraud:  Real Estate Payments)**

The Grand Jury further charges:

36.  The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

37.  From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to SILVER's honest services as an elected legislator and as the Speaker of the Assembly, for the purpose of executing such scheme and artifice and attempting to do so, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be

23

delivered by mail and such carrier according to the direction
thereon, and at the place at which it was directed to be delivered
by the person to whom it was addressed, any such matter and thing,
to wit, SILVER used the power and influence of his official
position to obtain hundreds of thousands of dollars in bribes and
kickbacks in the form of referral fees paid to him through the Real
Estate Law Firm, and in connection therewith and in furtherance
thereof, SILVER sent and received and caused materials to be sent
and received using the United States mail and private and
commercial interstate carriers.

(Title 18, United States Code, Sections 1341, 1346, and 2.)

## COUNT FOUR

**(Honest Services Wire Fraud:  Real Estate Payments)**

The Grand Jury further charges:

38.  The allegations contained in paragraphs 1 through
32 of this Indictment are repeated and realleged as if fully set
forth herein.

39.  From at least in or about 2000 through in or about
January 2015, in the Southern District of New York and elsewhere,
SHELDON SILVER, the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to defraud,
and to deprive the public of its intangible right to SILVER's
honest services as an elected legislator and as the Speaker of the

24

Assembly, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SILVER used the power and influence of his official position to obtain hundreds of thousands of dollars in bribes and kickbacks in the form of referral fees paid to him through the Real Estate Law Firm, and in connection therewith and in furtherance thereof, SILVER transmitted and caused to be transmitted interstate electronic mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNT FIVE

**(Extortion Under Color of Official Right:  Asbestos Payments)**

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

41.   From at least in or about 2003 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, while serving as an elected legislator and as Speaker of the Assembly, willfully and knowingly, did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as

25

that term is defined in Title 18, United States Code, Section 1951(b)(2), to wit, SILVER obtained Mesothelioma Leads, and the valuable legal claims connected thereto, for Weitz & Luxenberg and fees resulting therefrom through extortion under color of official right.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT SIX

**(Extortion Under Color of Official Right:  Real Estate Payments)**

The Grand Jury further charges:

42.  The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

43.  From at least in or about 2000 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, while serving as an elected legislator and as Speaker of the Assembly, willfully and knowingly, did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), to wit, SILVER obtained Tax Certiorari Business of Developer-1 and Developer-2 for the Real Estate Law Firm and fees

26

resulting therefrom through extortion under color of official right.

(Title 18, United States Code, Sections 1951 and 2.)

### COUNT SEVEN

(Monetary Transactions Involving Crime Proceeds)

44. The allegations contained in paragraphs 1 through 32 of this Indictment are repeated and realleged as if fully set forth herein.

45. From at least in or about 2006 through in or about January 2015, in the Southern District of New York and elsewhere, SHELDON SILVER, the defendant, willfully and knowingly, within the United States and involving United States persons, in an offense involving and affecting interstate and foreign commerce, did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, SILVER transferred the proceeds of the offenses charged in Counts One through Six of this Indictment to investments not available to the general public, in transactions affecting interstate commerce and through the use of checks in amounts greater than $10,000 drawn on financial institutions and deposited into bank accounts held at financial institutions, including the following transactions:

a. In or about July 2010, SILVER transferred a

27

check in the amount of $100,000 from the Silver Account to Investment Vehicle-1;

b. In or about July 2011, SILVER transferred a checks in the amount of $29,997.40 from the Silver Account to an account at a financial institution controlled in part by Investor-1 (the "Investor-1 Account"), which money was then distributed to an investment vehicle on behalf of SILVER;

c. In or about July 2011, SILVER transferred a check in the amount of $10,243.96 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

d. In or about June 2012, SILVER transferred a check in the amount of $27.879.15 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

e. In or about July 2012, SILVER transferred a check in the amount of $33,668.58 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER;

f. In or about February 2013, SILVER transferred a check in the amount of $50,000 from the Silver Account to the Investor-1 Account, which money was then distributed to an investment vehicle on behalf of SILVER.

g.     In or about April 2013, SILVER transferred a
check in the amount of $19,005.12 from the Silver Account to the
Investor-1 Account, which money was then distributed to an
investment vehicle on behalf of SILVER.

h.     In or about May 2014, SILVER transferred a
check in the amount of $16,397.72 from the Silver Account to the
Investor-1 Account, which money was then distributed to an
investment vehicle on behalf of SILVER.

(Title 18, United States Code, Sections 1957 and 2.)

## FORFEITURE ALLEGATIONS: COUNTS ONE THROUGH SIX

46.     As a result of committing one or more of the
offenses alleged in Counts One through Six of the Indictment,
SHELDON SILVER, the defendant, shall forfeit to the United States,
pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all
property, real and personal, that constitutes or is derived,
directly or indirectly, from proceeds traceable to the commission
of the said offense(s), including but not limited to all of
SILVER's right, title, and interest in:

a.     Any and all funds on deposit in HSBC Bank,
Account Number 646014943, held in the name of Sheldon Silver,
Counselor at Law;

b.     $368,000 on deposit in HSBC Bank, Account
Number 761883860, held in the name of JoRon Management LLC;

29

   c. $100,000 on deposit in Bank of America, Account Number 483025986924, held in the name of Counsel Financial Holdings LLC;

   d. Any and all funds on deposit in Synchrony Bank, Account Number 5005138390, held in the name of Sheldon Silver;

   e. Any and all funds and assets on deposit in Fidelity Investments, Account Number 614856932, held in the name of Sheldon Silver;

   f. Any and all funds and assets on deposit in Fidelity Investments, Account Number 613438626, held in the name of Sheldon Silver;

   g. Any and all funds and assets on deposit in Bank of New York Mellon, Account Number 980215084245, held in the name of Sheldon Silver;

   h. Any and all funds and assets on deposit in Morgan Stanley Smith Barney, Account Number 901010095, held in the name of Sheldon Silver;

   i. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of: JoRon Management LLC; Counsel Financial Services LLC and/or Counsel Financial Holdings LLC; Alpha Orbit LLC; Clover Communities Fund I, L.P.; Clover Communities Fund II, L.P.; Clover

Communities Fund III, L.P.; Clover - Brighton Square; Lerer
Ventures II, L.P.; and NewSat;

   j. All right, title, and interest in the real
property and appurtenances known and described as 32 Mountain
Drive, Woodridge, New York, 12789;

   k. All right, title, and interest in the real
property and appurtenances known and described as 550 Grand
Street, Apartments G-5A and G-5B, New York, 10002;

   l. All right, title, and interest in any fees
paid or to be paid to SILVER by the Real Estate Law Firm;

   m. All right, title, and interest in any fees
paid or to be paid to SILVER by Weitz & Luxenberg related to any
referrals from Doctor-1;
and all property traceable thereto.

Substitute Asset Provision

  47. If any of the above-described forfeitable
property, as a result of any act or omission of SHELDON SILVER,
the defendant:

   (1) cannot be located upon the exercise of due
diligence;

   (2) has been transferred or sold to, or deposited
with, a third person;

31

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property, including but not limited to all of SILVER's right, title, and interest in:

a.    Any pension fund to which SILVER may be entitled as a result of his employment as a member of the New York State Assembly and as Speaker of the New York State Assembly.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)

### FORFEITURE ALLEGATIONS: COUNT SEVEN

48.    As the result of committing the offense alleged in Count Seven of this Indictment, SHELDON SILVER, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the offense and all property traceable to such property, including but not limited to all of SILVER's right,

32

title, and interest in the properties listed in paragraphs 46(a) through paragraph 46(m) of this Indictment as set forth above.

## Substitute Asset Provision

47. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants, up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1957.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

33

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

SHELDON SILVER,

Defendant.

SUPERSEDING INDICTMENT

S1 15 Cr. 093 (VEC)

(18 U.S.C. §§ 1341, 1343, 1346, 1951,
1957, & 2.)

_____          PREET BHARARA
Foreperson            United States Attorney.

—TRVE BILL ? SVPERCEDING INDICTMGNT

— MAG. JUDGE RONALD L·ELLIS

4-23-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    -v.-

SHELDON SILVER,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  7/20/2020
```

CONSENT PRELIMINARY
ORDER OF
FORFEITURE AS TO SPECIFIC
PROPERTY/MONEY
JUDGMENT

S1 15 Cr. 93 (VEC)

WHEREAS, on or about April 23, 2015, SHELDON SILVER (the "defendant"),

was charged in a seven-count superseding Indictment, S1 15 Cr. 93 (VEC) (the "Indictment"),

with honest services mail fraud, in violation of Title 18, United States Code, Sections 1341, 1346,

and 2 (Counts One and Three); honest services wire fraud, in violation of Title 18, United States

Code, Sections 1343, 1346, and 2 (Counts Two and Four); extortion under color of official right,

in violation of Title 18, United States Code, Sections 1951 and 2 (Counts Five and Six); and

engaging in monetary transactions involving criminal proceeds, in violation of Title 18, United

States Code, Sections 1957 and 2 (Count Seven);

WHEREAS, the Indictment included a forfeiture allegation with respect to

Counts One through Six of the Indictment providing notice that, pursuant to Title 18, United

States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, the United

States seeks the forfeiture of all property, real and personal, that constitutes or is derived, directly

or indirectly, from proceeds traceable to the commission of the offenses alleged in Counts One

through Six of the Indictment, including, but not limited to, all of the defendant's right, title, and

interest in:

        a.      Any and all funds on deposit in HSBC Bank, Account Number 646014943,
             held in the name of Sheldon Silver, Counselor at Law;

    b.    $368,000 on deposit in HSBC Bank, Account Number 761883860, held in the name of JoRon Management LLC;

    c.    $100,000 on deposit in Bank of America, Account Number 483025986924, held in the name of Counsel Financial Holdings LLC;

    d.    Any and all funds on deposit in Synchrony Bank, Account Number 5005138390, held in the name of Sheldon Silver;

    e.    Any and all funds and assets on deposit in Fidelity Investments, Account Number 614856932, held in the name of Sheldon Silver;

    f.    Any and all funds and assets on deposit in Fidelity Investments, Account Number 613438626, held in the name of Sheldon Silver;

    g.    Any and all funds and assets on deposit in Bank of New York Mellon, Account Number 980215084245, held in the name of Sheldon Silver;

    h.    Any and all funds and assets on deposit in Morgan Stanley Smith Barney, Account Number 901010095, held in the name of Sheldon Silver;

    i.    Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of: JoRon Management LLC; Counsel Financial Services LLC and/or Counsel Financial Holdings LLC; Alpha Orbit LLC; Clover Communities Fund I, L.P.; Clover Communities Fund II L.P.; Clover Communities Fund III, L.P.; Clover-Brighton Square; Lerer Ventures II, L.P.; and NewSat; and

    j.    All right, title, and interest in the real property and appurtenances known and described as 32 Mountain Drive, Woodridge, New York,

and all property traceable thereto (a through j, collectively, the "Indictment Assets");

        WHEREAS, the Indictment included a second forfeiture allegation with respect to Count Seven of the Indictment, providing notice that, pursuant to Title 18, United States Code, Section 982, the United States seeks the forfeiture of, all property, real and personal, involved in the offense and all property traceable to such property, including but not limited to all of the defendant's right, title, and interest in the Indictment Assets;

WHEREAS, on or about May 11, 2018, the defendant was found guilty as to Counts One through Seven of the Indictment;

WHEREAS, on or about October 22, 2018, the Court entered a Preliminary Order of Forfeiture as to Specific Property/Money Judgment (the "First Forfeiture Order") (Dkt. No. 482) imposing a forfeiture money judgment in the amount of $3,739,808.53 and forfeiting all of the defendant's right, title, and interest in the following assets (subject to the defendant's appeal of his conviction):

a. $429,155.98 formerly on deposit at HSBC Bank, in account number 646014943, held in the name of Sheldon Silver, Counselor at Law (the "HSBC Funds");

b. $1,453,591.99 formerly held by Counsel Financial Holdings LLC in the names of Rosa Silver and/or Sheldon Silver (the "Counsel Funds");

c. $227,046.69 formerly on deposit at Synchrony Bank in account number 5005138390, held in the name of Sheldon Silver (the "Synchrony Funds");

d. $733,837.01 formerly on deposit in Fidelity Investments, account number 614856932, held in the name of Sheldon Silver (the "Fidelity Funds-1");

e. $169,221.18 formerly on deposit in Fidelity Investments, account number 613438626, held in the name of Sheldon Silver (the "Fidelity Funds-2");

f. $136,748.18 formerly on deposit in Bank of New York Mellon, account number 980215084245, held in the name of Sheldon Silver (the "Mellon Funds");

g. $339,928.70 formerly on deposit in Morgan Stanley Smith Barney, account number 901010095, held in the name of Sheldon Silver (the "Smith Barney Funds");

h. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at JoRon Management LLC, including, but not limited to, distributions totaling at least $43,935.17 currently held by the United States Marshals Service;

i. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Alpha Orbit LLC;

3

j. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover Communities Fund I, L.P., including, but not limited to, distributions totaling at least $52,280.83 currently held by the United States Marshals Service;

k. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover Communities Fund II L.P.;

l. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover Communities Fund III, L.P.;

m. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover-Brighton Square;

n. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Lerer Ventures II, L.P.;

o. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at NewSat;

p. All right, title, and interest in any fees paid or to be paid to Sheldon Silver by Goldberg & Iryami, P.C., including but not limited to $153,408.26 currently held by the United States Marshals Service (the "Goldberg & Iryami Fees");

q. All right, title, and interest in any fees paid or to be paid to Sheldon Silver by Weitz & Luxenberg related to any referrals from Robert Taub, including, but not limited to, $109,069.25 currently being held by Weitz & Luxenberg (the "W&L Fees"); and

r. Any and all share certificates or other ownership interest held by Sheldon Silver in Synacor Inc.;

WHEREAS, following the entry of the First Forfeiture Order, the Government seized the HSBC Funds, the Mellon Funds, the Synchrony Funds, the Counsel Funds, the Fidelity Funds-1, the Fidelity Funds-2, and the Smith Barney Funds (collectively, with the Goldberg & Iryami Fees, the "Seized Funds");

WHEREAS, on or about January 21, 2020, the United States Court of Appeals for the Second Circuit vacated the defendant's convictions on Counts One, Two and Five of the

4

Indictment, affirmed the defendant's convictions on the other counts of the Indictment, and remanded this matter for resentencing;

WHEREAS, the defendant consents to the entry of a money judgment in the amount of $1,355,927.10 in United States currency, representing (i) pursuant to Title 18, United States Code, Section 981(a)(1)(C), proceeds traceable to Counts Three, Four, and Six of the Indictment that the defendant personally obtained and (ii) pursuant to Title 18, United States Code, Section 982(a)(1), property involved in the offense charged in Count Seven of the Indictment that the defendant personally obtained;

WHEREAS, the defendant and the United States agree that (1) $1,355,927.10 of the Seized Funds shall be applied as a payment in full satisfaction of the Money Judgment; (2) the remainder of the Seized Funds shall be applied to any fine imposed by the Court (the "Fine Payment"); and (3) any of the Seized Funds remaining after the Money Judgment Payment and the Fine Payment shall be transferred to the defendant;

WHEREAS, the defendant and the United States further agree that the W&L Fees currently held by Weitz & Luxenberg, as of the date of this Order, no longer need be restrained by Weitz & Luxenberg and may be transferred to the defendant;

WHEREAS, the defendant and the United States further agree that any future fees paid or to be paid to Sheldon Silver by Weitz & Luxenberg may also be transferred to the defendant, provided that such fees do not relate to referrals from Robert Taub made prior to 2008;

WHEREAS, the defendant agrees that any future fees to be paid to Sheldon Silver by Weitz & Luxenberg to the extent those fees relate to referrals from Robert Taub made prior to 2008 (the "Pre-2008 Taub Referrals W&L Fees") are subject to forfeiture to the United States

5

pursuant to Title 18, United States Code, Section 981(a)(1)(C); the defendant consents to the administrative or civil forfeiture of the Pre-2008 Taub Referrals W&L Fees, and agrees that he will not file a claim or a petition for remission or mitigation or otherwise contest the civil or administrative forfeiture of the Pre-2008 Taub Referrals W&L Fees, and will not assist anyone else in doing so; and the defendant also waives all rights to service or notice of the any administrative or civil forfeiture proceeding with respect to the Pre-2008 Taub Referrals W&L Fees;

WHEREAS, the defendant additionally consents to the forfeiture of all his right, title, and interest in the following property which constitute proceeds traceable to the offenses charged in Counts Three, Four and Six of the Indictment that the defendant personally obtained and/or property involved in the offense charged in Count Seven of the Indictment that the defendant personally obtained:

    a. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at JoRon Management LLC, including, but not limited to, distributions totaling at least $43,935.17 currently held by the United States Marshals Service;

    b. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Alpha Orbit LLC;

    c. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover Communities Fund I, L.P., including, but not limited to, distributions totaling at least $250,661.02 currently held by the United States Marshals Service;

    d. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover Communities Fund II L.P.;

    e. Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover Communities Fund III, L.P.;

f.  Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Clover-Brighton Square;

g.  Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at Lerer Ventures II, L.P.;

h.  Any and all funds, assets, accounts, or notes held by, in the name of, as nominee for, and/or for the benefit of Sheldon Silver at NewSat;

(a through h, collectively, the "Specific Property"); and

WHEREAS, pursuant to Title 21, United States Code, Section 853(g), and Rules 32.2(b)(3), and 32.2(b)(6) of the Federal Rules of Criminal Procedure, the Government is now entitled, pending any assertion of third-party claims, to reduce the Specific Property to its possession and to notify any and all persons who reasonably appear to be a potential claimant of their interest herein;

IT IS HEREBY STIPULATED AND AGREED, by and between the United States of America, by its attorney Geoffrey S. Berman, United States Attorney, Assistant United States Attorneys Daniel C. Richenthal and Damian Williams, of counsel, and the defendant, and his counsel, James P. Loonam, Esq., that:

1.  As a result of the offenses charged in Counts Three, Four, Six, and Seven of the Indictment, to which the defendant was found guilty, a money judgment in the amount of $1,355,927.10 in United States currency (the "Money Judgment") shall be entered against the defendant.

2.  $1,355,927.10 of the Seized Funds shall be applied as a payment in full satisfaction of the Money Judgment (the "Money Judgment Payment").  The remainder of the Seized Funds shall be applied to any fine imposed by the Court at sentencing, and any Seized Funds remaining

7

after the Money Judgment Payment and the Fine Payment (the "Remaining Funds") shall be transferred to the defendant.

3.    The Remaining Funds, to the extent any exist, shall be transferred to the defendant in a manner consistent with the UFMS Vendor Request Form to be completed by defendant through his attorney James P. Loonam, Esq.

4.    As a result of the offenses charged in Counts Three, Four, Six and Seven of the Indictment, to which the defendant was found guilty, all of the defendant's right, title and interest in the Specific Property is hereby forfeited to the United States.

5.    Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, upon entry of this Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment, this Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment is final as to the defendant, SHELDON SILVER, and shall be deemed part of the sentence of the defendant, and shall be included in the judgment of conviction therewith.

6.    The United States Marshals Service is authorized to deposit the Money Judgment Payment in the Assets Forfeiture Fund, and the United States shall have clear title to such forfeited property.

7.    Upon entry of this Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment, the United States (or its designee) is hereby authorized to take possession of the Specific Property and to hold such property in its secure custody and control.

8.    Pursuant to Title 21, United States Code, Section 853(n)(1), Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions, the United States

is permitted to publish forfeiture notices on the government internet site, www.forfeiture.gov. This site incorporates the forfeiture notices that have been traditionally published in newspapers. The United States forthwith shall publish the internet ad for at least thirty (30) consecutive days. Any person, other than the defendant, claiming interest in the Specific Property must file a Petition within sixty (60) days from the first day of publication of the Notice on this official government internet web site, or no later than thirty-five (35) days from the mailing of actual notice, whichever is earlier.

9.      The published notice of forfeiture shall state that the petition (i) shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the Specific Property, (ii) shall be signed by the petitioner under penalty of perjury, and (iii) shall set forth the nature and extent of the petitioner's right, title or interest in the Specific Property, the time and circumstances of the petitioner's acquisition of the right, title and interest in the Specific Property, any additional facts supporting the petitioner's claim, and the relief sought, pursuant to Title 21, United States Code, Section 853(n).

10.      Pursuant to 32.2 (b)(6)(A) of the Federal Rules of Criminal Procedure, the Government shall send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

11.      Upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture with respect to the Specific Property pursuant to Title 21, United States Code, Section 853(n), in which all interests will be addressed.

12.      The defendant shall not file a claim or a petition for remission or mitigation or otherwise contest the civil or administrative forfeiture of the Pre-2008 Taub Referrals W&L Fees,

9

and will not assist anyone else in doing so. The defendant has waived all rights to service or notice of the any administrative or civil forfeiture proceeding with respect to the Pre-2008 Taub Referrals W&L Fees.

13.     The Post-Indictment Restraining Order, dated April 2, 2015 (Dkt. No. 30), to the extent it otherwise remains in force, is hereby vacated.

14.     The Court shall retain jurisdiction to enforce this Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

15.     The Clerk of the Court shall forward three certified copies of this Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment to Assistant United States Attorney Alexander J. Wilson, Co-Chief of the Money Laundering and Transnational Criminal Enterprises Unit, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

16.     The signature page of this Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment may be executed in one or more counterparts, each of which

will be deemed an original but all of which together will constitute one and the same instrument.

AGREED AND CONSENTED TO:

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: _____        _7/20/20_
     DANIEL C. RICHENTHAL                       DATE
     DAMIAN WILLIAMS
     Assistant United States Attorneys
     One St. Andrew's Plaza
     New York, NY 10007
     (212) 637-2109/2298


SHELDON SILVER

By: _____        _7/20/20_
     SHELDON SILVER                             DATE

By: _____        _7/20/20_
     JAMES P. LOONAM, Esq.                      DATE
     Attorney for Defendant
     Jones Day
     250 Vesey Street
     New York, NY 10281
     (212) 326-3808


SO ORDERED:

     _____        _7·20·20_
     HONORABLE VALERIE E. CAPRONI               DATE
     UNITED STATES DISTRICT JUDGE